Dan
v.
Brown

THADDEUS DAN AND SARAH HIS WIFE, JARED BETTS
AND ABBA HIS WIFE, HARVEY BETTS AND RUAH HIS
WIFE, ISAAC AYERS AND NANCY HIS WIFE, SAMUEL
HOYT AND BETSEY HIS WIFE, MATHAN HOYT AND
ELIZABETH HIS WIFE, AND SANFORD SELLICK,
*against*
BENAJAH BROWN, JAMES BROWN, SILAS BROWN, WEED
BROWN, SETH BROWN, AND JOTHAM BROWN.

ON petition of partition, under the act for the partition of land. (1 R. L. 507.) The plaintiffs presented their petition to the Supreme Court, for the partition of certain lands laying in the county of Rensselaer. The defendants pleaded *non tenent insimul*, and annexed to the plea a notice, that Benajah Brown, senior, previous to his death, made and executed his will, in due form of law, for the passing of real property, and at the time of his death, left the same will unrevoked and uncancelled, by which he devised to the defendants the whole of the real property mentioned in the petition. The cause was tried at the Rensselaer Circuit in July, 1823, before DUER, C. J.

On the trial, the seisin of Benajah Brown, deceased, as stated in the petition, being admitted by the defendants, and the plaintiffs having proved his death while so seised, this was holden sufficient.

*One of the subscribing witnesses to a will of lands, may prove its execution, on a trial at law. And this, though the will be lost, or not produced in court.*

*And where a witness to a lost will proved its due attestation by three witnesses, but had forgotten the name of one of them, having no doubt, however, that he was a competent witness, this was holden sufficient.*

The parol declarations of a *devisor* will not amount to a revocation of a will of lands; nor can they be received upon a question of revocation, unless they relate to the *res gestæ.* They are then evidence to show the intent with which the act was done.

To revoke a will by cancellation, this must be done *animo revocandi.* The slightest degree of cancellation, &c., with intent to revoke, will operate as a revocation.

To warrant giving parol evidence of a will not shown to be destroyed, it must be first proved that diligent search for it has been made, by or at the request of the party interested, at the place where it is most likely it would be found; as among the papers of the devisor at his residence, if the will do not appear to have been deposited in any public office.

This search may be proved by a party in the cause, who made the search; though he be interested; as it is merely addressed to the court, in order to let in secondary proof.

The admission of a plaintiff or defendant will in general affect none but himself; and not his co-plaintiff or defendant, unless they are his partners.

Thus, in partition, by several tenants in common against others, on a plea of *non tenent insimul*, the admission of one of the plaintiffs, that a will was lost, shall not be received to affect his co-plaintiff.

The confession of one tenant in common of lands, is not evidence against his co-tenant.

and that the plaintiffs, parties to this suit, except those claim ing in right of their wives, were his heirs at law, being his children, except Sellick, who was his grand child ;

James Mallory was called by the defendants, and testified that he had been well acquainted with Benajah Brown, deceased. That he made his will on the 9th day of November, A. D. 1816, at the office then occupied by the witness and William L. Marcy, in Troy. That the will was drawn by Mr. Marcy. That after it was executed, Brown delivered it to the witness for safe keeping. That the witness gave a receipt for the will, on the day it was executed, which he then had, and that he ascertained the date of the will from the receipt. That in the summer or fall of the year 1821, Brown called upon the witness to get the will, and stated that he wished to add a codicil to it. The witness delivered the will to him. He further testified, that since the death of Brown, in a conversation with Jared Betts, one of the plaintiffs, he told the witness that the will could not be found ; That James Brown had been up at Brunswick, from Westchester, and looked for the will in the desk where he supposed it was left, and it could not be found there.

Thomas Clowes, surrogate of Rensselaer, called by the defendants, testified that Harvey Betts, Thaddeus Dan and James Brown, applied to him on the subject of the administration of the estate of Benajah Brown, deceased ; that Betts and Dan said, they presumed there had been a will, that search was made, but it could not be found ; and the witness stated a long conversation between these persons, as to the existence, search for, and probable loss or concealment of the will. That they finally petitioned for letters of administration and made affidavit that Benajah Brown died intestate, upon which letters were granted. That James Brown stated, that his father told him, a few days before his death, that his will was in his desk at Brunswick, locked up with other papers, which he specified, and stated where he had left the key of the desk. That he found it there, and unlocked the desk with it ; but did not find the will. Benajah Brown resided at Brunswick, Rensselaer county ; but died in Westchester, on a visit to his children, in 1812. The

defendants then offered to prove the contents of the will on the ground that they had proved its existence and loss, or satisfactorily accounted for the non-production of it. The plaintiff's counsel objected, but the court overruled the objection.

William L. Marcy was then called as a witness, who testified, that in the autumn of 1816, Benajah Brown, now deceased, called, in company with James Brown, one of the defendants on James Mallory (who at the time occupied an office with the witness) to draw a will for him. Mr. Mallory requested the witness to draw the will, which he did, and after he had drawn and engrossed it, Brown deceased, executed it in presence of three witnesses, and those three witnesses signed their names to the will in the presence of the deceased and of each other. The witness was one of these witnesses, and James Mallory was another, and who the third witness was he could not recollect; but from the circumstance of the deceased depending upon him to see that the will was properly executed, he has no doubt that the third witness was a credible witness. At least, he is satisfied that he must have thought so, at the time of the execution of the will; and he thinks the third witness must have been a person of his acquaintance, and have been called upon by him to witness the execution of the will.

The counsel of the defendants were proceeding to prove by this witness the contents of the will, to which the counsel for the plaintiffs objected, upon the ground that the defendants had not shown who were the three witnesses in whose presence the will was executed, and had not proved the due execution of the will; but the Judge decided, that the defendants had sufficiently proved the execution of the will, and were entitled to prove its contents by parol. Upon this Marcy testified that, by the provisions of the will, the deceased devised the one-sixth part of all his real and personal estate to each of his sons, James, Weed, Seth, Jotham, and Silas, and one-sixth part to James Brown, his son, in trust. The avails of this, during the life of Benajah, one of the defendants, were to be paid to him, and to his children, and after his death the remainder of the sixth

part was to be paid to his children, and that the devise of the real and personal property was charged with the payment of two hundred dollars to each of the daughters of the deceased, and the like sum to Sanford Sellick, his grand son.

Upon this testimony, the jury found a verdict for the defendants.

*J. Payne*, for the plaintiffs, moved for a new trial; and contended,

1. That the execution of the will was not sufficiently proved. The witness must be able to testify to all which the statute of wills requires. One of the requisites is, that the witnesses should be credible. This should appear. The heir does not know them. Their names should be given, that the heir may know what witnesses he is to meet and the jury pass upon their credibility. (1 Phil. Ev. 377, Am. ed. of 1820, and note (*b*). *Jackson* v. *Le Grange*, 19 John. 386, 388. Bull. N. P. 264.)

2. That the declarations of Benajah Brown, made during his last illness, were inadmissible to prove the execution of his will, or to repel the presumption that it had been destroyed by him. (*Jackson* v. *Kniffen*, 2 John. Rep. 31. Roberts on Frauds, 307. *Doe* v. *Perkes*, 3 B. & A. 489, 491. 2 Phil. Ev. 196, 7.)

3. If the will was destroyed, by any person, before the death of Benajah Brown, it ceased to be a will. (Roberts on Wills, 21. *Lawrence* v. *Kete*, Alleyn, 54. *Havard* v. *Davis*, 2 Bin. 406. 1 Eq. Cas. Abr. 402.)

4. That the verdict was against law and evidence.

*A. Spencer*, (same side,) said he should rely on *Gray* v. *Pentland*, (2 Serg. & Rawle, 23, 25, 26,) *Jackson* v. *Root*, (18 John. 60,) 1 Phil. Ev. Am. ed. 1820, p. 346, and *Williams* v. *Younghusband*, (1 Stark. 139,) to show what degree of strictness was necessary in the proof of loss; *Wilson* v. *Barem*, (15 John. Rep. 286,) and *Rex* v. *Inh. of Morton*, (4 M. & S. 48,) that declarations *in extremis* are inadmissible, except in cases of homicide; *Goodright* v. *Glacier*, (4 Burr. 2512,) as to what acts are necessary to destroy a will; to the same purpose, *Pemberton* v. *Pemberton*, (13 Ves. 290.)

He also cited *Burthenshaw* v. *Gilbert*, (Cowp. 49,) Gilb. on Dev. 115, and 1 Phil. Ev. Am. ed. 1820, p. 173.

*J. P. Cushman* and *A. Van Vechten*, contra. The will was sufficiently proved. It was with Mallory 4 years, when the devisor took it, with the view to a codicil. He afterwards declared, that it still existed, and several of the plaintiffs stated that it could not be found. This evidence was not objected to, and the whole case must rest on the sufficiency of the proof of loss. As to this, the Court are referred to *Livingston* v. *Rogers*, (1 Caines' Cas. Err. 27 ;) *Jackson* v. *Lucett*, (2 Caines' Rep. 365 ;) *Jackson* v. *Hasbrouck*, (12 John. Rep. 192 ;) *Jackson* v. *Frier*, (16 id. 193, 196 ;) and *Caufman* v. *Presbyt. Con. of Cedar Spring*, (6 Bin. Rep. 59.) Having proved the loss, we went to the proof of execution. This was made out with all the requisite formalities. The circumstance of loss does not vary the mode of proof. One witness is enough, (*Jackson* v. *Le Grange*, 19 John. Rep. 388,) whether the will be produced or not; and it is for the heir to impeach him by calling the other witnesses. The word *credible* in the statute, (1 R. L. 364,) when it speaks of the witnesses, means, at any rate, no more than *competent;* and competency is always to be presumed, till the heir show the contrary. The witnesses may be entire strangers to each other, or subscribe at different times, and it would be hardly possible to reach the strictness demanded of us. Who of the legal profession, when they write and attest wills, charge themselves with names? If not, and the will happen to be lost, it must be unavailable, unless the proof in the present instance be enough. The hardship upon the heirs is no answer. The presumption is always in favor of supporting the will. (*Bond* v. *Seawell*, 3 Burr. 1773.) Suppose the names obliterated, or eaten out by rats, how are we to know them; yet, it cannot be denied, that the will may, notwithstanding, be established. Where all the witnesses are dead, yet the will may be proved. You intend that the execution was regular from proof of the handwriting. (8 Vin. 125, *Will*, (N. 7.) *Hands* v. *James*, Com. Rep. 531.)

Has the will been revoked ?   This cannot be pretended, as to any mode of revocation pointed out by the statute, which is express that the will shall not be revoked in any other way.  Implied revocations are all confined to alterations in the devisor's circumstances.

As to the act of revocation, the declarations of the devisor are admissible, whether before, at, or after the act. This is no infringement of the statute.   To what is it addressed ?   To the *quo animo.*   Suppose a case of tearing. The question immediately arises *quo animo* is this done ? And most of the cases cited in 2 Phil. Ev. 197, relied on against us, agree that this may be shown by the devisor's declarations.   The case of *Bibb* v. *Thomas,* (2 Bl. Rep. 1044,) and *Brady* v. *Cubit,* (2 East, 534, and note *a,*) go distinctly to this.

We deny that the will must be in existence at the devisor's death.   Suppose it had been accidentally burnt, or the heir had destroyed it, is its effect gone ?   In the case cited against this, of *Lawrence* v. *Kete,* (Alleyn, 54,) the question was put to the jury ; and the case is the less satisfactory, because it arose before the statute relative to the attestation of wills.   Shep. Touch. 411, is a direct authority that the loss in the devisor's lifetime, only has the effect to throw the burthen of proving the contents upon the heir ; and what was said in *Goodright* v. *Harwood,* (3 Wils. 512, 13,) admits the doctrine fully.   (*Havard* v. *Davis,* 2 Bin. 406, cited on the other side, S. P.)

The declarations of James Brown cannot now be objected to as incompetent ; because they were admitted at the trial without objection.   All that can now be done is to deny their sufficiency.   They certainly fortify the legal presumption, in itself very strong, that the will existed.

It will not be pretended, that the admissions of Betts and others were incompetent.   They were parties to the issue of *non tenent insimul,* and were of course competent.   True, we might have examined James Brown, as a witness to the loss of the will.   So might the opposite party ; and because he is a competent witness, it does not follow that the plaintiffs' admissions against themselves are not competent.   If Brown's declarations are not evidence, *per se,* they are so as

being made in the presence of Betts and Dan, who joined in the same declarations. What the declarations were worth, was for the jury to say.

*Spencer,* in reply, would not inquire whether it was necessary to show the name of the third witness; nor whether the destruction of the will in the devisor's lifetime, without his consent, would have destroyed it; but he considered the evidence at large, (*the whole of which, I have not thought it necessary to detail,*) in order to show that the will was in truth cancelled or destroyed during the devisor's lifetime, and with his consent. He denied, upon the authority of the cases of *Pemberton* v. *Pemberton,* (13 Vesey, 292,) and *Doe* v. *Perkes,* (3 B. & A. 489,) before cited, that the declarations of the testator could have any effect in setting up a cancelled will. He said they are mere hearsay evidence, inadmissible, unless a part of the *res gestæ.* The act of cancellation implies the *quo animo.* The law intends that it was done with intent to destroy the will. If gentlemen are correct, it must be done in the presence of witnesses. The presumption of an intention to revoke had often been held to follow the act of cancellation or destruction. To rebut to this, and defeat the title of the heir, the proof should be clear and convincing. (Gilb. on Dev. 115.)

*Curia,* per WOODWORTH, J. The will of Benajah Brown was proved by one of the subscribing witnesses. He stated that it was executed in presence of himself, James Mallory and another person, whose name he did not recollect; but had no doubt of his being a credible witness. This was all the evidence that could be expected, under the circumstances of the case. It was, *prima facie,* sufficient. In the case of *Hands* v. *James,* (Com. Rep. 531,) where all the witnesses were dead, it was submitted to the jury to determine, whether the witnesses to the will set their names in the presence of the testator, merely upon circumstances, without any positive proof; upon the ground that there could not, probably, be any express proof, as few are usually present beside the devisor and witnesses, and, from the nature of the case, the proof must be circumstantial. It was observed that three witnesses had set

their names; and it must be intended that they did it regularly; that one witness was an attorney of good character, and may be presumed to understand what ought to be done, rather than the contrary. Here the attorney drew the will, subscribed it as a witness, and testifies to every thing but the name of the third witness. It seems to me, that, from this, the presumption of due execution is irresistible.

The execution of the will being· established, the next question is, whether there was any evidence that it was cancelled. On this point, I lay no stress upon the declarations of the testator. They were made long after the execution of the will, and shortly before his death. They are not evidence, unless they relate to the *res gestæ*, or to an act done; as where, by mistake, the will is torn or thrown into the fire. The declarations of the testator are, in such cases, evidence, where they show the *quo animo.* (12 John. Rep. 33.) The act of cancelling is, in itself, equivocal, and will be governed by the intent. The rule is, that if the testator lets the will stand until he dies, it is his will; if he does not suffer it to do so, it is not his will. It is ambulatory until his death. (4 Burr. 2514.) There must be a cancelling *animo revocandi.* Revocation is an act of the mind, which must be demonstrated by some outward and visible sign of revocation. The statute has prescribed four. If any of them are performed in the slightest manner, joined with a declared intent to revoke, it will be an effectual revocation. (2 Bl. Rep. 1044.) The evidence here does not warrant any such intent. The testator, several months before his death, called for the will, and wished to add a codicil. There is no other act that indicates an intent to make the least alteration. No act was done, or dissatisfaction expressed upon which to raise a presumption. The most that can be urged is, that the testator expressed a desire to make some alteration by way of codicil, from which it is rather to be inferred that the general features of the will were approved, and that an additional, or greater provision, was contemplated, for some of the objects of his bounty. The conclusive answer is, that all this was inchoate. It rests merely in an intent expressed

at one time, and to a single individual. We are left entire-
ly to conjecture, whether the testator ever afterwards did a
single act to warrant the presumption of cancelling the will,
in whole or in part. I, therefore, consider the will as re-
maining in force at the testator's death.

The more important question is, whether it sufficiently
appears that there has been diligent search for the will
where it was most likely to be found, so as to warrant the
introduction of secondary evidence. The general rule is,
that to entitle a party to give parol evidence of the con-
tents of a will, when there is not conclusive evidence of its
destruction, it must be shown that diligent search has been
made in those places where it would most probably be
found. (12 John. 192.)

In examining this question, I will first consider the place
where the will was most likely to be found. The will not
having been recorded, no resort need be had to a public of-
fice. It is last traced to the hands of the testator, who resi-
ded in Brunswick. His desk and other papers were there.
He died from home on a visit to his children in Westches-
ter. I think the defendants are bound to show due search
among the papers of the deceased, at his usual place of
residence; and if, on such search, the will cannot be found,
parol evidence is admissible. James Brown might have
been examined as a witness to the Court, on this collateral
point, but he was not. The question then rests on the evi-
dence introduced by the plaintiff. Any declarations of
Brown, independent of that, are not evidence.

James Mallory testified that Jared Betts, one of the plain-
tiffs, informed him that the will could not be found; that
James Brown had been up to Brunswick, and looked for
the will in the desk, where he supposed it was left, and it
could not be found. This is certainly a very explicit ad-
mission by one of the plaintiffs. Harvey Betts and Thad-
deus Dan stated to the surrogate, that they presumed there
had been a will, but it could not be found; and that search
had been made. The plaintiff's counsel introduced the
petition and affidavit of Brown, Betts and Dan, to obtain

Dan
v.
Brown.

administration.   These, however, are silent as to the question, whether due search had been made.

The defendants, who claim under the will, were called on to prove that they had made diligent search.   Search by other persons, and not at their request, will not suffice. The admission, by Jared Betts and Thaddeus Dan to the surrogate, was, not that Brown, or either of the defendants, had made search, but generally, that the will could not be found.   In what manner, and by whom search was made, they do not state.   It was an admission that did not exonerate the defendants from giving affirmative proof of search made by them or some of them.

The only evidence remaining, is the statement made by Jared Betts on another occasion.   Although this admission might have been sufficient to conclude him, if he had been the only plaintiff, it ought not to affect the interest of the other plaintiffs who claim as tenants in common with him. If an ejectment is brought by tenants in common, the plaintiff may give in evidence the separate titles of the several lessors to separate parts of the premises, and recover accordingly.   (12 John. 185.)   But it would seem an unjust rule. which would suffer one tenant in common to admit away the rights of others.   As far as I have been able to discover, an admission by a party to the record is evidence against him who makes it; and where there are partners, against them also; but not against others who happen to be joined as parties to the suit.   The cases which speak of the admission as proper evidence, will be found to have reference to a sole plaintiff or defendant.   The confession, then, of Jared Betts, that Brown had made search, was no evidence to dispense with the production of the will, and furnished no ground to admit secondary evidence, so far as the other plaintiffs were concerned.   On this point, the verdict should. be set aside, and a new trial granted.

New trial granted.