SOPHIA W. HARGROVES, plaintiff in error, *vs.* JAMES K. REDD, propounder, defendant in error.

1. The Circuit Courts of the United States have no jurisdiction over the probate of wills; and a proceeding before the Ordinary of this State, propounding a will, cannot be removed to the Circuit Court by one of the caveators, who is a resident and citizen of another State.

2. An admission, in writing, of certain material facts, for the purpose of

being used in the trial of a cause, cannot be recalled after the trial has commenced.

3. Where a testator, by his will, made in 1852, directed certain of his slaves to be sent, after his death, to a free State, and there to be emancipated, and bequeathed to them, when free, a large portion of his estate, and before the death of the testator, the slaves were, by law, made free in this State, and the testator died, leaving his will unrevoked, this is not such a change of the relation between the testator and legatees as makes the will inoperative.

4. A will, duly executed, and making dispositions in accordance with law at the time it was made, is a good will, notwithstanding, after it is made, a law is enacted making such dispositions illegal, if, before the death of the testator, said law is repealed or becomes obsolete, and the testator have done no *act*, expressly or by implication, revoking or recalling his will.

5. A legacy in a will, to legatees capable of taking it at the time the will is made and also at the time of the death of the testator, is not void, because there was a period intermediate between the making of the will and the death of the testator, when the legatees were incapable of taking such legacy and the same was illegal and void.

6. Parol evidence is inadmissible to show, of itself, the revocation of a will; such evidence can only be introduced to explain and show the intention of equivocal acts, by the testator, or by his direction, destroying or abrogating his will.

Removal to United States Courts. Admissions, Parol evidence to vacate wills. Before Judge JOHNSON. Muscogee Superior Court. May Term, 1870.

This case was here at December Term, 1869, and a new trial was granted. See *Redd vs. Hargroves et al.*, 40 Georgia Reports, 18. The will and grounds of caveat are there fully set forth. When the cause was called for trial below, all the defendants except Sophia W. Hargroves were allowed by the Court below to withdraw from the case, without prejudice. Sophia W. Hargroves filed her petition, averring that she was a citizen of Alabama, had reason to believe, and did believe, that, from prejudice or local influence, she could not obtain justice in said Court, etc., gave bond, as is required by the Acts of Congress for removal, and moved to remove the cause, as to herself, to the United States District Court. This motion was overruled.

To the grounds of caveat set forth in the original case, were added several others, as follows:

1st. Testator honestly believed that all of said will which related to emancipation was annulled by law before his death and would remain void, and, but for this, would have destroyed it; frequently he said, and by his conduct expressed, that those parts of said paper were not his will.

2d. Emancipation has made said will ambiguous; it is uncertain whether said negroes were to take only if they remained his slaves until his death, or should take, in spite of emancipation, before his death; and evidence should be allowed to explain this ambiguity.

3d. At emancipation, said slaves, except one, abandoned him in his old age; one accused him wrongfully of larceny, and had him arrested; all which made him more positively desire to change the objects of his bounty by making a new will, instead of this one, which he long thought was annulled by the Act of 1859.

4th. The emancipation clauses, at testator's death, "sounded of folly," and were, therefore, void.

Redd's counsel demurred to the original and the added grounds of caveat, and the demurrer was sustained.

Thereupon the said Sophia amended her caveat by alleging in writing that said paper writing, propounded as the will of said Thomas, was not his will.

Redd offered in evidence a certain writing as a copy of the will of said Thomas, which was proven to be a copy. Defendant objected to the admission of said copy. Redd proved that the original of said copy was torn by mistake, into small strips by the late Judge (Worrill) of said Court, when making up his opinion in the case at a previous term, and offered as evidence, an admission in writing, signed by the counsel for defendant, at the term of the Court of Ordinary when said paper was first propounded for probate, by which they admitted that said torn paper was duly executed by said Thomas, as his last will and testament, in the pres-

Hargroves *vs.* Redd.

ence of the three witnesses thereto subscribed, viz : *  *  *
each of whom subscribed and attested the same, in the pres-
ence of said Thomas, and at his request, in the presence of
each other.

Defendant objected to the said admission as evidence, say-
ing that her counsel had, on the day before, pending the
trial, withdrawn said admission, which was admitted by the
counsel for said Redd, but the Court overruled said objec-
tion and received said admission, because they had been used
on all the *former trials,* and because of the *lateness of the*
notice of withdrawal. And thereupon, Redd read said copy
and said torn strips to the jury as evidence, and said admis-
sions, and closed his case.

Defendant introduced divers witnesses, who testified as
follows :

JAMES K. REDD, the person named as executor in said
propounded paper, swore: that during and after the late war
he had had repeated conversations with Owen Thomas; that
in last conversations the said Thomas said that the will of
which said Redd was the executor, was no longer in exist-
ence; that he had made a new will, in which he had given
his property to his nephews, and that the said Thomas seem-
ed to think that the said Redd might feel hurt at the loss of
the legacy of $1,500 00, given to him in the former will,
and wished to propitiate him ; that in the conversations after
the war the said Thomas denounced, with *bitter curses,* his
negroes, saying that they had abandoned him when set free,
and left him to starve in his old age, knowing as they did,
what he had intended to do for them if he could have had
his own way.

DR. WILLIAM FLEWELLEN, who was for many years
Thomas' family physician, swore: That he had had many
conversations with said Thomas during and after the war,
and that in last conversations Thomas said that he had
a will in which he had given his property to his three
nephews, James, Robert and Owen Thweatt; that he had at

one time a will setting free his negroes, but that the same was no longer his will, and was of no account; that in the conversations after the war, Thomas cursed bitterly his negroes, saying that, as soon as they were set free, they had deserted him and left him to perish, although they knew that he would have freed them at his death if he could.

HENRY L. BENNING swore as follows: He was sent for by Owen Thomas three times, shortly before his death, to write his will; went twice, first time about six weeks or two months before his death. After sitting awhile, himself asked Thomas if he had not sent for him to make out his will. Thomas said yes. Witness asked him if he did not have a will. Thomas said he had no will. Witness said you know I helped to write you a will once, setting free your negroes. Thomas said yes, but that amounts to nothing now, or is no will now, or something to that effect. Witness—"Have you destroyed it?" Thomas—"No." Witness—"You had better let me see it." He said it was in a bureau drawer, to which Margaret (a servant girl) had the key, or he called her and gave her the key. Witness or Margaret opened the drawer which was filled with old papers, and witness found an old dingy newspaper package or roll without fastenings. In this was the will freeing the negroes, and another will made previously in 1842, or about then, and some other papers, the contents of which witness did not recollect. Witness read it over by Thomas' bedside, not audibly, but afterwards referred to its contents, when Thomas denounced his negroes with furious oaths for having deserted him; said he was glad the will was no account, and that he would never give them a cent. He praised Margaret, and said she had been very kind to him; but he cursed Jim, her brother, above all the rest, because Jim, he said, had brought him before the military bureau, charged with stealing his jewelry. Witness asked him what property he had. He said he did not have much. "I have this place, one thousand acres of land, about $2,500 or $2,600 in King's bank, and one hun-

dred and eighty or one hundred and eighty-five bales of cotton in Liverpool, which, by my instructions, was not to be sold until cotton got to be a dollar a pound, except just enough to pay expenses." His mind then wandered; he spoke of being surrounded by enemies; said there they are now under the house. "Don't you hear them?" Thomas said, "I will show you," and got up, though very feeble, and assisted by witness, went out at the front door and peeped under the house, and seeing nothing, seemed to be rather mortified at the failure of his words. His mind continued to wander in this way, on imaginary enemies, until he was recalled to some particular subject, when he became perfectly rational, and remained so as long as he was kept to that subject; but the constant tendency was to wander off and talk nonsense. Witness thought that his lucid intervals would not last through the time required to compose a will of average length, and therefore did not propose to write one for him; and as he did not specially request it, none was written. After staying some hours, witness returned home.

The next time witness was called to him, was two or three weeks afterwards, when his engagements prevented him from going. Some days afterwards, on a third call, witness went to him and found him in the same condition in which he was at the first visit—his mind sometimes rational and sometimes not, with a constant tendency to the hallucination aforesaid, about his enemies; and for that reason witness did not attempt to write his will, though he said he had sent for him to have it written. There was a pocket book in the same drawer where the will was. Witness gave the will to Margaret, stating to her to keep it; it might benefit her some day. It was the same paper propounded.

GAMMELL swore: That he had had many conversations with Thomas; that Thomas was perfectly sane until a short time before his death; that he always spoke of his intentions to give his property to his nephews; that he cursed his negroes bitterly after they left him when set free; that on his, wit-

ness' intercession and entreaty, he allowed Jim to return; and on one occasion sent for him, witness, and told him that he could not stand Jim any longer, and asked witness to drive Jim off

THOMAS B. SLADE swore: That after the raid he met Thomas when in a violent passion against his negroes, saying that they had left him and carried off his mules. He was perfectly sane. Witness, a minister of the gospel, often conversed with Thomas fully and freely about his religious condition. Thomas always received what witness said with respectful attention.

JAMES M. RUSSELL swore: That whilst Columbus was under the military bureau, Thomas came into his office in a rage, saying that Jim had accused him before the military officer with stealing his (Jim's) jewelry, and wished witness to go with him before the tribunal. This witness would not do, until Thomas promised to calm himself and to allow witness to manage his case. They went before the officer. Jim was there; an investigation was had; Thomas was discharged for lack of any evidence against him. He had kept quiet during the investigation, but when it was over, he let out on Jim with awful curses.

JAMES T. THWEATT swore that Sophia W. Hargroves was the sister of Owen Thomas; that he (witness) and his brothers were the nephews of said Owen, (sons of his deceased sister, Mrs. M. J. Thweatt;) that, when the negroes were set free, all of Thomas' negroes left him except Margaret; that he was constantly denouncing and cursing them for having done so; that none of them returned but Jim, and that he was allowed to return at the entreaty of Mr. Gammel; there was some gold and silver in the bureau drawer where the will was found.

R. J. MOSES testified, that about six months before the death of Owen Thomas, he called on witness and asked him what he would charge to make a will, but Thomas would not pay the fee which he charged for drawing the will; witness

replied, to avoid that, I will take your note, payable one day after your death ; and added, while I will not draw your will for less than $100 00, I will tell you how to do it, and if it is simple as you say, you can do it as well as I can ; he then as instructed Thomas, who left, making some general reply, not remembered by witness.

The caveator here closed her case.   The Court then asked counsel of caveator for what object the testimony on the part of caveator had been introduced and submitted, to which inquiry it was replied that it was not introduced to show incapacity on the part of the testator, but to show a revocation of the will.   The Court thereupon excluded all the testimony from the jury, ruling that a will could not be revoked by subsequent declarations of intention or desire.

The paper was thereupon established as the will of Owen Thomas.

It is said that the Court erred in refusing to allow said cause removed to the United States Court, in sustaining the demurrer to said grounds of caveat, in admitting the copy paper, and the admissions of counsel as evidence, and in rejecting said evidence of defendant's witnesses.

PEABODY & BRANNON ; H. L. BENNING ; JAMES M. RUSSELL, for plaintiff in error, by permission of the Court, reviewed the former decision of this Court, citing the Act of 1859 ; Code, sec. 1878 ; 18 Ga. R., 1 ; Acts of 1852–70 ; 25 ' Ga. R., 657 ; Acts of 1854–70 ; 1 Bl. Com., 160, 161 ; Dwarris on Stat., 682–3, marg.; 6 Bing., 258 ; (19 E. C. L., 75 ;) 16 Ga., 102 ; 12th, 475 ; 38th, 350 ; 40th, 493, 501 ; 34th, 458.   As to an unperformed condition : Redfield on W., 177, 178.   As to mistake of law : Code, secs. 3027, 3065, 3067. As to ambiguity : Code, secs. 2421, 3748.   As to foolish will : Swinburne on W., part 2, sec. 3 ; 3 Eccl. R., 91.   The evidence of his acts and declarations were admissible to show mistake : Code, secs. 3063, 3749 ; 32 Ga. R., 156 ; 17th, 444 ; 28th, 52.   To show that the negroes were not to take unless

Hargroves *vs.* Redd.

they served him while he lived : Code, secs. 2421, 3748 ; 7 Ga. R., 438 ; 28th, 262 ; 32d, 156 ; 17th, 444 ; 14th, 596 ; 6 E. C. C. L. R., 175 ; 5th, 444 ; 1 Red. on Wills, 557, 560, note, 45 ; 40 E. C. C. L. R., 92. To show it had ceased to express his wishes : 1 Eng. C. C. L., 141, 158, 159, 95.

INGRAM & CRAWFORD ; WILLIAMS & THORNTON ; RAMSEY & RAMSEY ; M. H. BLANDFORD, for defendant.

MCCAY, Judge.

1. The Circuit Courts of the United States have, under the statutes organizing them, no probate jurisdiction. They have no machinery for recording a will, issuing letters and directing and supervising the administration. Any judgment they could give in the premises would only be collateral, and not final. This is, as we understand it, the settled rule, and the Circuit Courts uniformly decline the jurisdiction.

2. It appears, by the record, that the admission sought to be withdrawn was first made in previous trials of this case. It may fairly be presumed that the propounder has rested on this admission, and has not at hand the proof necessary to supply it. We will not say such an admission may not be withdrawn, but full and timely notice ought to be given— such notice as would give a reasonable time to the other side to supply the gap its withdrawal makes in his case. This withdrawal was proposed to be made *during* the trial. We agree with the Judge that this was too late—the notice too short. True, the Court might have continued the case, but both the other side and the public have a right that a speedy trial shall be had, and that the time and expense already devoted to the case shall not be lost.

3. It seems very clear to us, that there is nothing in the change of circumstances, to-wit : in the emancipation of these slaves, that will justify the position taken by the plaintiff in error, to-wit : that the intentions of the testator cannot be

Hargroves *vs.* Redd.  ·

carried out.  It is very evident that the direction to carry the slaves out of the State, was only a means of securing their freedom, and wholly collateral to the leading idea, to-wit: their freedom.  The bequest is to them *as freemen*, not as residents out of the State; and, as they have become free by the laws, without the removal, we think the removal unnecessary:  See the case of *Green vs. Anderson*, 38th Georgia, 655.  It has been assumed in the argument of this case by the plaintiff in error, that it was a general rule of law, that a total change in the *circumstances* of a testator, is a revocation of his will; but this is far from being true.   True, there is a heading of this kind in most of the books upon wills, but it will be found that it has a very confined scope.   Indeed, it seems to be confined to that change of circumstances produced by the marriage and birth of a child, or to the marriage of a female testatrix:  Code, 2441; 1st Redfield on Wills, 292, 302.   There is not a case to be found, as I believe, in which a change in the amount of the testator's property has been held to revoke his will.   Nor has it ever been held, except in the theories of some old writers, that a change in feelings of friendship, or of good or ill will between the testator and the legatee, can be used as the basis of an implied revocation.   The law not only points out how wills shall be made, but throws many restrictions around the revocation of them.   Experience has shown that testators, surrounded as they often are by contestants for legacies, need protection in this respect; and it has been thought wise, by by the lawmakers, to require distinct proof of revocation.  The doctrine of implied revocation has been more and more limited, until it is now confined to a few specific cases, such as marriage or the birth of a child, under circumstances showing that, at the date of the will, the testator did not contemplate such an event, and for which event, he, by his will, made no provision.

4. The argument of this case has turned mostly upon the effect of the Act of 1859 and the Code, upon this will.  By our

laws, previously to 1859, a will directing slaves to be sent out of the State and then emancipated, was good; and bequests to them under such provisions were held good:  16th Georgia, 496.  In 1859, an Act was passed providing that emancipation, in or out of the State, by will, was illegal and the will void.  So, also, old Code, section 1874.  The emancipation of the slaves, as the result of the late war, and the consequent change of the Constitution of this State and of the United States, have rendered this law, as well as the Act of 1818, obsolete.  Thomas made the will now propounded for probate, in 1852, when, by our law, such a will was a valid and good will.  He died in 1867, after the Act of 1859 had become obsolete, after the slaves had been emancipated, after they became capable, as freemen, of taking, in this State, the bequests of the will.

It has been argued, that though this will was a good will when made, and though it might lawfully take effect at the death of the testator, yet, as such a will was illegal and void under the Act of 1859, it was by this Act revoked, and cannot now be set up as a will unless republished.  We fully considered this point when this case was before us, at the December Term, 1869 : 40th Georgia, 18.  We have allowed that decision to be questioned, as provided by section 204 of the Code, and we have listened, with open ears, to the able and elaborate arguments of the plaintiff's counsel, against the view we then took of the law as applicable to the facts of this case.  But we are constrained to adhere to the position we held in that decision, to-wit: that, as this was a lawful will when made, and a lawful will when the testator died, it may lawfully be probated, notwithstanding the Act of 1859, which was passed after the will was made, but became obsolete before the testator died.

The very meaning of the word revoke, involves a change of mind in the testator.  A careful consideration of the different acts which the books and the statute treat as evidence of revocation, will show that the idea of a change of mind of

the testator, is a fundamental one in questions of revocation. There is some act of the testator, some exercise of his will, by which he either expressly recalls his previous disposition, or from which the law implies that he intended so to do.    I do not think a case can be found, where a *will* has been held to be *revoked* by anything else than the testator's own act.

The cases of making an inconsistent will, or of tearing and obliterating, are plain, and the evident foundation of the rules regulating the effect of marriage, birth of children, etc., is that, in such cases, the *testator* has done an *act* from which it may be fairly inferred he intended to change the disposition of his property.    It is true, such acts are now, by our statute, *made* acts of revocation and conclusive acts; but at common law, the foundation of them was, that when one had thus, *by his acts*, placed himself in such new relations, there arose the presumption that he intended to revoke, recall, his former will.

By our Code, sections 2434, 2442, wills may be revoked, either by an express act annulling the will, or by making an inconsistent will.    It is provided, also, that marriage of the testator or the birth of a child to him, subsequent to the making of the will, shall be a revocation.    I greatly doubt if there be, under our law, any other revocations than are provided for; and these are all, either express *acts*, directly revoking, or *acts* from which the law conclusively presumes the *testator intended* to revoke.    For if, in any authorized way, he shows that he did not so intend, the revocation does not take place.    So far as I have been able to find, no act of others has been held so to alter the presumed motives of the testator as to furnish legal *data* for a presumption of revocation.    Though the bitterest feuds arise between the testator and his legatees, though great changes take place in the property of the testator and in the wants of the legatee, though all the reasons for the bequest may fail, yet the law does not undertake, except in the instances specified, to make for him

a change in his dispositions, which he has not himself indicated in some legal way.

I am aware that it is often said a will is revoked by a "change in a man's circumstances," and "by an alteration of his estate." But though these phrases are used in the books, it will be found, on examination, that they have a very limited application. The only "change of circumstances," given as instances of this kind of revocation, is marriage and birth of a child, or marriage alone of a female. So far as I can find, these are the only cases. Swinburne, part 7, section 15, says: "But no man is *presumed* to have revoked his testament. Insomuch that if a man live forty years after he has made his testament, yet is not the testament presumed to be revoked by the course of so long time? Though his wealth and substance increase, yet is not the testament revoked?" As to "alteration of estate," this rather has reference to specific devises, of particular real estate. As a will is a conveyance, it was held that, if at any time before the testator dies, the nature of his title to the estate changes, the devise is revoked: 1st Redfield on Wills, 332 to 342. And this is the case referred to by the plaintiff's counsel in Roll's Abridgment, 617, upon which so much stress has been laid, and which our Brother Russell, has taken so much pains to have properly translated. "If a man had devised a use before the statute of 27th Henry, 8, which devise was *revoked* by the statute, because the use was transferred to the possession, yet, if after the statute of 32 Henry, 8, concerning devises, he had *allowed* the same without writing, this had been a new publication." And, also, the case in Anderson's Reports, page 7, when one devised land before the statute of uses, the statute is treated as revoking the devise.

But, both these cases, as will be observed, are not cases of the revocation of wills, but of devises, and are nothing more than the common case put in the books when the title of the testator to land had *altered*, after the making of the will, and

before his death.  The decisions are founded on the common rule, that after-acquired real estate does not pass by a will. A change in the title, from a use to a legal estate, was held to be a new estate, and it did not pass by the will without a new publication.  That the provisions of a will have, by a change in the law, become illegal, is not an act of the testator, nor does it furnish any ground for presuming any change of his intention.  Nothing is more common than for men to make *illegal* bequests; men are constantly making wills in ignorance of the law.  It is true, that a man will not be presumed to violate the law, nor to intend to do so.  But if he have intended a particular act, and have expressed that intention in writing in the form of a will, and he keep the paper by him, executed with all the forms of law, unrevoked by any act of his, it is saying a great deal to say that he is to be presumed to have *changed* his intentions, as expressed in his will, because those intentions have become illegal.  He may not have known the change of the law; he may have thought his will was not obnoxious to it; he may have thought the law would be changed.  So long as he keeps by him, *expressed* according to the required forms, his intention, and does no act himself which amounts in law to a revocation, the inference is almost irresistible that he intends just what his acts indicate.

Had this testator died while the Act of 1859 was of force, and had this will been presented to the Ordinary for probate, would the heirs-at-law have thought of setting up that it was *revoked?*  The objection would have been, not that the intentions of the testator had changed, but that his intentions were illegal, and could not be set up.  The will would have been void, not because it was not the expression of the testator's wishes, but because those intentions were illegal, and the Courts could not permit them to be carried into effect. I do not think, therefore, that it is a proper use of language to say that the Act of 1859 *revoked* wills obnoxious to its provisions.  It made wills emancipating slaves, in the State

or out of it, *void*. But what is a will? When does a paper become a will? Until the death of a testator, his will is under his own control. It gets its *whole* vitality from his death. We inquire into his surroundings at the making of it and during his life, to find out whether he made it, what he intended by it, and whether, at any time after it was made, he revoked it; but it never becomes a will, or has any practical, legal effect as such until the testator has died—has, by having it unrevoked at his death, said, by his failure to change it, "That is my last will." Until then, it is a paper of his own, inchoate, ineffective, subject entirely to his own *volition*. It is his private paper, the expression of his intentions for the future, which he may or may not alter, at his own pleasure. It is not a paper that the law can operate upon, since it has no validity until, by his death, it becomes his *last will*. It is like a deed, written, signed and sealed, but not delivered. It may or may not ever see the light, and it depends for its validity on the law at the time of his death, just as a deed depends for its validity on the law at the time of its delivery. If the Act of 1859 is to be considered as going into the cabinet of the testator, and making the papers, deeds and wills, there laid away to be used or not used, as the maker of them may determine, some very strange results would follow. By the Act of 1818, Cobb's Digest, 991, slave property intended to be emancipated contrary to law, was subject to sequestration. Will it be contended that a deed, yet in the custody of the maker of it, or a will before the death of the testator, emancipating slaves, rendered the property liable to sequestration? The old Code, section 1875, declares that every such will, testament, deed, contract, agreement, etc., shall be null and void; and section 1876 makes any person violating, *or* attempting to give effect to any instrument violating said provisions, liable to a penalty of one thousand dollars. If the statute goes into the private receptacles of the testator, and operates upon his papers lying there, which he has not yet, by his acts, made or attempted

to make *effective,* and makes them void, would he not also be liable to the penalty, for having and keeping such papers by him? Such a result would be absurd. And yet it is the logical deduction from the proposition, that the Act of 1859 operated upon this paper, as it lay in the trunk or safe of the testator, subject at any time to his volition, and made it illegal and void.

In the sense of the statute, the words will, deed, testament, etc., evidently mean only papers to which the maker of them has given his final assent, and not papers he still has in his own custody, and which he may or may not deliver, or die leaving unrevoked. The authorities on the subject of wills abundantly sustain this view of the matter. The making of a will is but the *inception* of it, and it doth not take effect until the death of the testator: 4 Co. Rep., 61 *b.* The case of *Sutton vs. Chenault,* decided by our own Court, 18th Georgia, 1, turns upon this very principle. The paper then in question was held no will, because the law, at the death of the testator, required a will to have three witnesses, and the Court say, however, it was lawfully executed when made, yet it did not *become* a will until the testator died. Until the death of the testator, the paper expressing his wishes is not a will; it is a mere inchoate act, which may or may not be a will, accordingly as the testator may or may not alter, or revoke, or destroy it. He is free to do this at any time. He cannot, by our law, even bind himself in it not to revoke it. Whenever it becomes irrevocable, it is no longer a will: Code, 2434. Experience has, however, found it necessary to limit, within certain fixed bounds, the *modes* in which wills may be revoked.

It will be found, I think, that the classifications of our Code pretty nearly, if not quite, exhaust the subject: 1st. Express revocations by writing: Section 2435. 2d. Revocations by inconsistent wills, which to be effectual must ultimately take effect: Section 2435. 3d. Revocations by acts mutilating, erasing or destroying the paper executed as a

will, in which case the question of intention arises, and evidence of declarations is admissible. 4th. Revocations by change of domestic relations, which, by our law, is confined to two specified changes, to-wit: marriage or the birth of a child subsequent to the making of a will in which no provision is made in contemplation of such an event: Section 2441. If there be any other mode of revoking *a will* it does not now occur to me. Wills may be *void* for want of proper execution, for illegality, for disability of the testator, and *legacies* may be adeemed and set aside for fraud and mistake, and even imposed upon the testator by contract. But wills, as such, must be revoked in some of the ways mentioned. The case now under consideration is rather a question of the revocation or failure of a legacy than of a will. Without doubt, here is a good will, even without the provision for the negroes. The bequest to his sister would remain even if the legacy to the negroes falls. It may be fairly said, too, that the *emancipation* clause is not necessary to sustain this legacy. What that proposed to do has been done without any help from this clause. The negroes are free even if that clause be void.

5. The point of this case that the legatees, though capable of taking the legacy at the date of the will, under its provisions, and though capable of taking it at the death of the testator, without the emancipation, were, for a time, to-wit: from 1859 to June, 1865, incapable of taking. The question is perhaps not materially altered by this view of it, since from 1859 to 1865 the legacy to them would have been illegal. And, if the doctrine contended for be true, the Act of 1859 revoked the legacy because it made it *illegal.*

We state the case, however, in this way, because, whilst it is almost impossible to find a case where a will, lawful at the time of making it, and lawful at the death of the testator, has yet been unlawful during a portion of the time intermediate; yet there are numerous cases put in the books, of specific legacies or devises, where this very state of things has ex-

isted.  By the ancient law, heretics, apostates, traitors, felons, outlaws, excommunicated persons, could not take a legacy or be executor:  Swinburne on Wills, part 5, section 2, par. 1.  Yet he says:  "For this is perpetual, that if any person be incapable either when the testament is made or when the testator dieth, it is as if he were always incapable. But it hindereth not if he be incapable at other times."

And again, part 7, section 19, paragraph 1, after saying that a legatee must be capable of taking at the death of the testator, he adds:  "As for any other time, whether it be *betwixt the making of the will and the testator's death,* or betwixt his death and the probation of the will, it skilleth not."  So of the ability of one to make a will, he says—part 7, section 17, par. 2:  "And here note, that there be two times wherein it is necessary that there be in the person of the testator ability to make a will; the one is the time of making the testament, when it secureth his substance or being; the other is the time of the death of the testator, when it receiveth his strength and efficacy.  As for the time betwixt the making of the testament and the death of the testator, it skilleth not whether the testator have any such power or not."

6. By the 6th section of the Statute of Frauds, and by our Code, section 2437, wills are irrevocable, except by some other will in writing, or by burning, cancelling, tearing or obliterating the same.  As these acts of tearing, cancelling, etc., may sometimes be equivocal in their meaning, and as the intent is of the essence of such acts, parol evidence and parol declarations of the testator to explain such acts, are necessarily admissible, though there are decided cases confirming even declarations explanatory to the time the act was done: 8 Jurist, New Series, 440; Doe vs. Palmer, 6 English Law and Equity, 155.  But declarations by a testator that he has no will, that he has destroyed a former will, declarations of his dislike to the legatees of a will, indeed, *all* declarations are inadmissible. to show a revocation.

The statute points out how wills shall be revoked, to-wit: by a new will or other writing, expressly revoking, or by an inconsistent will actually made, or by any destruction or obliteration of the original will, done with intent to revoke: Code, sections 2434, 2438. Parol evidence of declarations, and other acts, are admissible to *explain acts* equivocal in their nature, or to show what was the intent with which they were done. But to permit evidence of parol declarations by a testator, declaring a revocation, or expressing his opinion of the validity or invalidity of a previous will, would be to repeal the Statute of Frauds.

At last, in reference to the whole question, is not the simple fact that Mr. Thomas made this will, *and kept it by him unaltered,* in spite of the Act of 1859, and in spite of all the changes produced by emancipation, and died with it still in existence, wrapped up and carefully preserved, as the evidence shows—is not this conclusive evidence that he intended it to stand? Does it differ from the everyday case of one putting off from day to day the making of a will, more suitable to his present surroundings than some older will, until death takes him unawares, and he dies with his will unaltered? The statements it is proposed to prove have hardly any weight. Nothing is more unreliable in fact, than the declarations of men upon such matters. That eminent portrayer of human nature, Mr. Dickens, who, as it is now said, was himself some time in a proctor's office, makes one of his characters, long experienced in wills and their incidents, say, while searching for the will of a deceased friend, that his declarations, made but a few days before his death, to the effect that he had a will, was very strong evidence that no will would be found. The law wisely treats such evidence as worthless, except in explanation of acts of destruction or cancellation, and we think the Judge was right in rejecting it.

Judgment affirmed.