STRAFFORD.

---

HOITT, *Ap't*, v. HOITT & *a.*

The revocation of a will is not effected by the death of legatees or devisees named in it; nor by the marriage of the testator, there being no issue of the marriage; nor by the alienation of the larger portion of his estate, which was specifically disposed of by the will; nor by the acquisition of other estate to an amount much greater than he possessed at the time the will was made; nor by the concurrence of all the above circumstances.

Declarations of a testator to the effect that he understood a will made by him was revoked, are not admissible on the question of revocation.

Declarations of a testator as to his intention in the disposition of his property, are not competent evidence from which to ascertain his intention as expressed in the will.

APPEAL from a decree of the probate court, disallowing the will of Gen. Alfred Hoitt, who died in Dover, November 9, 1883.   The will bears date February 12, 1864, and its due execution is admitted.   The question involved is that of revocation.   The material facts are as follows: At the date of the will the testator had a wife, the mother of his children, and six sons and seven daughters, ten of whom were of age.   His estate at this time amounted to some $26,000, about two thirds of which was realty, comprising eight different parcels.   Included in the personalty were sixty shares of the Boston & Maine Railroad, and twenty shares in the Langdon

Bank. These stocks were specifically bequeathed, but, with the exception of four shares of the railroad stock, were subsequently sold by the testator and not replaced. All of the realty was specifically devised, but the testator afterwards disposed of the greater portion of it. He subsequently acquired by purchase and was possessed at his decease of other real estate of the value of about $52,000. His entire estate at the time of his death was appraised at $70,951.82. His wife died April 25, 1877. He married a second wife January 6, 1879, who still survives. There was no issue of this marriage. All the children are living except Franklin, who died unmarried in 1877. Four sons were named by the testator as residuary legatees, one of whom, Franklin, has since died. When the will was executed, the residue of the estate was inconsiderable.

After the testator's death the will was found in his safe, in a bundle of papers of no pecuniary value. Included in this bundle were several apparently incomplete drafts or memoranda of wills never executed, without date, some of which were apparently made since the date of the will.

At the trial the appellee offered evidence of the oral declarations of the testator to show that it was his understanding that the will was revoked, and also to show that it was not his intention to pass by his will after acquired real estate. To this the appellant objected. The court sustained the objection, and the appellee excepted.

*Augustus Russ* (of Massachusetts), *Jeremiah Smith*, and *Dodge & Caverly*, for the appellant. If total revocation is to be implied in this case, it has got to be implied from changes in the situation of the testator's property, and from those changes alone. The appellee, indeed, claims that it is to be implied from changes in property taken in connection with other changes of a different nature. But there are no other changes in this case which can be considered as having a legitimate tendency to justify an implication of total revocation. The other changes relied on are the death of the first wife and Franklin, and the testator's second marriage. The marriage of a testator has not been regarded, either in Old England or New England, as cause for implying total revocation. And there is no reason at this day for overturning the settled doctrine in order to protect the wife's interests, inasmuch as the wife is now given by statute a large and well defined share of the estate, of which the husband's will cannot deprive her. The death of devisees has not been considered as cause for implying total revocation. *Doe* v. *Edlin*, 4 Ad. & E. 582, 586; *Warner* v. *Beach*, 4 Gray 164; *Fellows* v. *Allen*, 60 N. H. 440, 441.

But if either of these changes (marriage of a testator, or death of devisees) could ever be considered in any case as affording cause for implying total revocation, certainly there is no ground

for so considering them in this case. The testator's first wife, who was living at the date of the will, would have been entitled (if she so elected) to a certain statutory share of the estate. The second wife is entitled to the same proportionate share that her predecessor could have claimed. The death of Franklin diminishes, rather than strengthens, the grounds for implying revocation. In consequence of Franklin's death, there is an intestacy as to one quarter of the residue, and that quarter must be distributed among all the children. This distribution will largely compensate the loss which some of the legatees might otherwise have sustained from changes in the situation of the testator's property.

Will total revocation be implied from such changes in investments as are detailed in this case? Total revocation would not be implied for this cause in any place outside of New Hampshire. The authorities are unanimous and overwhelming. *Wogan* v. *Small*, 11 Serg. & R. 141; *Balliet's Appeal*, 14 Penn. St. 451; *Vandemark* v. *Vandemark*, 26 Barb. 416; *Verdier* v. *Verdier*, 8 Rich. Law (S. C.) 135; *Graves* v. *Sheldon*, 2 D. Chip. (Vt.) 71; *Blandin* v. *Blandin*, 9 Vt. 210; *Warner* v. *Beach*, 4 Gray 162; *Webster* v. *Webster*, 105 Mass. 538; *Hawes* v. *Humphrey*, 9 Pick. 350; *Carter* v. *Thomas*, 4 Me. 341;—see, also, as to implied revocation, *Hargroves* v. *Redd*, 43 Ga. 142, 151, 154, 160; *Card* v. *Alexander*, 48 Conn. 492—*S. C.*, 40 Am. Rep. 187; *Charlton* v. *Miller*, 27 Ohio St. 298—*S. C.*, 22 Am. Rep. 307.

The present case differs widely from *In re Cooper's Estate*, 4 Penn. St. 88. The substance of the will in that case was as follows: "I hereby direct my executors to sell and dispose of my new brick house, the proceeds of which are to be disposed of in the following manner: After the payment of my funeral expenses and all my just debts, I give and bequeath [pecuniary legacies to five out of seven children], and the residue or balance of my property, after payment of the above legacies, real, personal, and mixed, I leave [to wife for life, and at her death to the other two childred]." Afterwards the testator sold the brick house. At his death, the personal property (other than that derived from the sale of the house) was barely sufficient to pay his debts. The will was treated as revoked by the sale, on the ground that the testator in selling "was sweeping away the very foundation on which it rested." The debts and legacies were to be paid out of a fund to be raised by a sale by the executors; and "by the very terms of the will, the residuary legatees were to take nothing but the balance of the estate after payment of debts and the pecuniary legacies." The testator had provided how the residue should be ascertained; but the testator's own subsequent act had rendered it impossible for the executors to perform the provision upon which all the other provisions were essentially based.

It is very clear that the Pennsylvania court did not intend to overrule the previous decision in *Wogan* v. *Small*, *supra*, which

they substantially reaffirmed in the later case of *Balliet's Appeal, supra.*

If an entirely new rule is to prevail here, it can only be by virtue of some statute, and the appellee ought to be required to produce unmistakable evidence of legislative intention. There is an *a priori* improbability that the legislature would enact that changes in investments or increase of property should work a total revocation. No such principle is in force elsewhere. The practical consequences of adopting such a principle would be disastrous. The inevitable result would be to produce infinite uncertainty, expense, and delay in the settlement of estates. It would be impossible to lay down any definite test as to the nature or extent of the change requisite to justify implication of revocation. To say that the change must be great, is "to raise a question rather than establish a rule." How shall it be determined what changes are great, and what are small? The court cannot hold this will totally revoked by changes in property without making the decision a precedent: not necessarily a precedent for reaching the same final result, but a precedent for the right to raise and litigate this objection. It has heretofore been supposed that changes in the testator's property afforded no ground for objecting to the probate of the will; but if the appellee prevails here, every dissatisfied heir will hereafter be able to delay the settlement of the estate, if there has been any change in the property, however slight. He will be entitled to be heard on the question whether the changes have been sufficient to justify implying revocation.

Further: Implying revocation on this ground would be utterly incongruous with the existing law as to express revocation. If the appellee should produce here an express written revocation, signed and sealed by the testator, and attested by one witness, it would be rejected as no better than a blank paper. G. L., c. 193, s. 14; *Reese* v. *Court of Probate of Newport*, 9 R. I. 434; *Barry* v. *Brown*, 2 Demarest 309; *Will of Ladd*, 60 Wis. 187—*S. C.*, 50 Am. Rep. 355. If the legislature will not permit revocation upon such an explicit declaration of the testator's intention, is it probable they would enact that a will might be revoked upon the uncertain guess of a judge as to the intention of the testator?

The statute of New Hampshire on revocation of wills is as follows:

Sec. 14. No will, or clause thereof, shall be revoked unless by some other valid will or codicil, or by some writing executed in the same manner, or by cancelling, tearing, obliterating, or otherwise destroying the same by the testator, or by some person by his consent and in his presence.

Sec. 15. The preceding section shall not control or affect any revocation of a will, implied by law, from any change in the circumstances of the testator or his family, devisees, legatees, or estate, occurring between the time of making the will and the death of the testator. G. L., c. 193.

The statute of wills (32 Henry VIII) contained careful provi-
sions as to the mode of executing wills, but was silent as to the
mode of revocation.   The courts subsequently allowed proof of
revocation by parol.   Then the statute of frauds (29 Charles II)
was passed, containing provisions as to revocation substantially as
in our present *s.* 14.   The courts thereafter held that the statute
of frauds applied only to express revocations, and that there might
be revocation by implication in certain classes of cases.   *Brush* v.
*Wilkins*, 4 Johns. Ch. 506, 511.

The cases in which the law would imply revocation came to be
reasonably well defined by repeated decisions.   They were very
few in number.   "An entire revocation by implication of law is
limited to a very small number of cases."   *Shaw*, C. J., in *Warner*
v. *Beach*, 4 Gray 162, 163.   "The doctrine of implied revocation,
although the offspring of arbitrary construction, is well defined by
settled rules and principles; and therefore, although it is the pre-
sumption of a change in the testator's mind that induces the impli-
cation, that presumption is artificial and merely legal.   Hence the
facts from which it may arise are as well defined as the doctrine
of revocation itself has been by the authorities which have estab-
lished and recognized it."   *Robertson*, C. J., in *Sneed* v. *Ewing*, 5
J. J. Marshall 460, 471.   "The revocation of the will takes place
in consequence of a rule or principle of law, independently alto-
gether of any question of intention of the party himself."   *Marston*
v. *Roe*, 8 Ad. & E. 14, 55.

Sec. 15, *c.* 193, Gen. Laws, was first enacted as a proviso at the
close of *s.* 7, *c.* 28 of the Laws of 1822.   The first part of *s.* 7 pro-
hibits revocation except by certain specified methods, as in the
present *s.* 14.   Then comes the following proviso: "Provided that
nothing in this section contained shall be construed to control or
affect any revocation of a will to be implied according to law from
any change in the circumstances of the testator, his family, dev-
isees, legatees, or estate, occurring between the time of making the
will and the death of the testator."

On its face, this proviso is not creative, but recognitive.   Its
purpose would seem to be, not to establish new causes of implied
revocation, but to negative any possible implication that the exist-
ing causes were intended to be repealed by the immediately pre-
ceding legislation.   If, then, it is to be construed as introducing
new causes of revocation, this must be because it contains language
admitting of no other reasonable interpretation.   This, however, is
not the case.   The words of the statute descriptive of the various
kinds of revocation are fully satisfied by the then existing causes
of implied revocation.   They are the same words and phrases then
used by the courts in discussing the same subject.   They must be
taken to have been used in the statute in their legal signification.
1 N. H. Rep. 55; G. L., *c.* 1, *s.* 2,   This statute is not to be "torn
from the general body of the law, taken literally, and administered

as if there were no other law." See 58 N. H. 390; 2 Austin Jur. 681.

In ascertaining the recognized legal meaning of the statutory phrases, it should be borne in mind that two kinds of revocation are evidently referred to, viz., total and partial revocation. Total revocation debars probate, annuls the instrument: partial revocation does not prevent probate, or destroy the instrument, but merely curtails its operation and effect after it is probated.

We proceed to take up each of the statutory phrases, and ascertain its legal meaning in 1822.

The phrase "circumstances of the testator or his family" had, in legal signification, a very confined scope. In the case of a woman, it was limited to the change produced by her marriage: in the case of a man, it was limited to the change produced by the creation of new family ties, including birth as an essential ingredient. This phrase is thus confined in the very opinion upon which the appellee so largely relies,—*Johnston* v. *Johnston,* 1 Phillim. 447. (See *pp.* 473, 474.) The phrase is sometimes used in text-books without a full explanation of its limited meaning. These passages in text-writers are copied from opinions in the reports; and, upon reference to the facts of the decided cases, it will be found that the phrase was there used in the signification we have given. Compare, for instance, Kent the commentator with Kent the chancellor. 4 Kent Com. 521, and 4 Johns. Ch. 518, 519; see, also, *McCay,* J., in 43 Ga. 151, 154. It is claimed by the appellee that the law was not, in 1822, completely settled as to what would be sufficient "change of circumstances." It seems to us that it was then pretty well settled. See Lord *Ellenborough,* C. J., in *Doe, dem. White* v. *Barford,* 4 M. & S. 10, 13; and compare *Tilghman,* C. J., in 11 Serg. & R. 141, 145. But it is enough to say, that whatever doubt or discussion then existed related solely to the nature of the new family ties required to be formed, whether birth alone, taken in connection with other circumstances, was enough, or whether there must be both marriage and birth subsequent to the date of the will. No one contended that change in property alone was enough, or that such a change could be considered as substantive cause for implying total revocation.

Change in "devisees or legatees" referred to changes produced by the death of a devisee in the life of a testator, having (in certain cases) the effect to annul the particular devise,—thereby, in a certain sense, partially revoking the will.

Change in the testator's "estate" referred to changes produced by alienation of property devised. Such alienation worked a revocation *pro tanto* to the extent of the conveyance, but no more. There was no total revocation unless there was a conveyance of the whole estate. So long as there remained anything upon which the will could operate, there was no total revocation. See 60 N. H. 441.

Giving, then, to each term in the statute its settled legal signification, it follows that change in property or in investments is not thereby established as a cause for implying total revocation.

But we do not rest this construction of the statute on intrinsic evidence alone. We cite the opinions expressed by the revisers of the statutes, both in New Hampshire and in Massachusetts. Argument of Charles H. Atherton (one of the New Hampshire revisers) in 12 N. H. 375; note of commissioners on Massachusetts revision of 1836; Report, part 2, *p.* 26, note to *c.* 62, *s.* 6. We also rely with great confidence on the construction put upon the statute of 1822 by the bar and people of New Hampshire. During the sixty years which have elapsed since 1822 there have been numerous instances where great alterations in property took place between the making of the will and the death of the testator. Yet it has never occurred to any one that these changes afforded ground for implying total revocation. The failure to litigate this question is decisive of the general understanding of the community.

It is, in effect, argued that the statute, upon our construction, is superfluous, inasmuch as part of the above named causes of implied revocation would result *ex necessitate*, and the chief reason for revocation by marriage and birth was taken away by a preceding section of the same chapter (*c.* 28, Laws of 1822). Admitting for the sake of argument that the statute is superfluous, it is not the first unnecessary enactment in our code. (See 52 N. H. 456, and Smith's N. H. Reports 531.) Is it not more probable that the legislature should have enacted a superfluous statute, than that they should have intended, under cover of this innocent looking proviso, to introduce a sweeping, radical, and dangerous change in the law? On the face of this proviso no one would suspect it could be intended to introduce anything new. Its apparent purpose is merely negative,—to rebut any possible presumption that the preceding paragraph was intended to annul or repeal the then existing judicial doctrine as to causes of implied revocation. The intention was, not to create new causes of implied revocation, but to leave our courts at liberty to adopt, so far as they saw fit, the causes then judicially recognized. If the legislature labored under a misapprehension as to the necessity for the statute, this misapprehension cannot afford reason for giving the statute a scope they never dreamed of.

An argument from analogy may perhaps be brought forward by the appellee. He may say, that if revocation is to be implied from marriage and birth, it should also be implied from changes in the financial situation of the testator; that the latter class of changes, as well as the former, may justify the presumption of a change in the testator's intention.

To this argument from analogy there are several answers: The rule that revocation may be implied from marriage and birth is itself an exception, and an indefensible exception, not to be ex-

32*

tended by analogy. It is an exception improperly introduced into the English law by judicial usurpation of legislative functions. The general rule is that established by the statute of frauds (29 Car. 2), that wills can be revoked only in the modes there pointed out. Parliament ought, undoubtedly, to have included marriage and birth among the statutory causes of revocation; but they were not so included, and the subsequent adoption of this cause by the courts was nothing more nor less than an unwarrantable judicial amendment of the statute. The language of the statute of frauds affords convincing proof of this statement. The 6th section of the original statute, relative to revocation of wills of realty (the basis of our section 14), is as follows:

"And, moreover, no devise, in writing, of lands, tenements, or hereditaments, nor any clause thereof, shall be revocable, otherwise than by some other will or codicil in writing, or other writing, declaring the same, or by burning, cancelling, tearing, or obliterating the same by the testator himself, or in his presence, and by his direction and consent; (2) but all devises and bequests of lands and tenements shall remain and continue in force until the same be burnt, cancelled, torn, or obliterated by the testator, or by his direction, in manner aforesaid, or unless the same be altered by some other will or codicil in writing, or other writing, of the devisor, signed in the presence of three or four witnesses, declaring the same; any former law or usage to the contrary notwithstanding."

It would seem difficult to make legislative meaning plainer. The statute contains not only a negative clause prohibiting revocation except by certain specified methods, but also an affirmative clause, expressly declaring that all devises shall remain in force unless revoked by those methods. And the section concludes with the significant words, "any former law or usage to the contrary notwithstanding." Taking all these facts together, it seems very clear that parliament did not intend to except implied revocations from the operation of the 6th section. If, however, there could be any doubt on this point, it must be entirely removed by considering the language of the next two sections of the original statute (*ss.* 7 and 8, relating to declarations of trust). Section 7 prohibits all declarations of trust except in writing. Section 8 expressly excepts implied trusts from the operation of *s.* 7. Now, if the framers of the statue intended to except implied revocations, *why did they not insert a special clause to that effect, as in the case of implied trusts?*

The provisions of *s.* 22 of the statute of frauds, relative to revoking wills of personalty, were much less stringent than those of *s.* 6, relating to wills of realty. It was early held that marriage and birth operated as a revocation of wills of personalty. But it was not until nearly a century after the enactment of the statute, and not until after great doubt and hesitation, that the same doctrine

was finally established with reference to wills of realty. No court of last resort decided a case on this ground until 1771, when the case of *Christopher* v. *Christopher*, 2 Dick. 445, was decided by three judges against one. The dissenting opinion then delivered, and the doubts expressed both before and since (4 Ves., Jr., 848; 2 East 540, 541; 1 Ves. 192), have had marked effect in inducing courts to decline to extend the exception then introduced. It was felt that it would not be the extension of a well founded general rule, but the extension of what was originally an unwarrantable exception to a general rule.

The reason often given for this judicial amendment of the statute is, a presumption of change in the testator's intention. This talk about "presumption" helped to conceal the fact that the judges were really establishing a new and arbitrary rule of substantive law. Presumptions "are resorted to by the courts as a means of legislating indirectly." 1 Austin Jur. 509. This reason is now thoroughly exploded in the country of its origin. In *Marston* v. *Roe*, 8 Ad. & E. 14, it was held, that the revocation of a will by marriage and birth "takes place in consequence of a rule or principle of law, independently altogether of any question of intention of the party himself." Indeed, any other doctrine would completely annihilate the statute of frauds. If implied revocation is founded on a presumption of fact as to actual change of intention, parol evidence of the testator's declarations must be admissible to rebut this presumption; and parol evidence of his counter declarations must be equally admissible to sustain the presumption. The inevitable result is, that the court admits the very testimony which the statute "anxiously and carefully excluded." In short, the appellee is relying on an exploded reason for an erroneous exception.

But even if the doctrine of implying total revocation from marriage and birth had been properly introduced into the law, this would not justify the adoption of the further doctrine that total revocation should be implied from changes in property. The two causes of revocation are not analogous. Marriage and birth are definite facts, about which there is generally no dispute; and when once the facts have been ascertained, there can be no room for uncertainty as to the law. There is no question of degree, no question of discretion. But change of property would be a cause of total revocation not susceptible of measurement by any definite rule. The nature and extent of the changes would frequently be matter of controversy, as in this very case; and if the extent of the change could be definitely ascertained, there would remain the further question whether the change of property was, under all the circumstances, sufficient to justify a presumption of change of intention. For the determination of this question, no test whatever can be laid down. It is idle to say that the change must be "great." That presents the same difficulty under a different name.

There is no standard whereby to determine what changes shall be considered great, and what shall be considered trifling. It would be a matter of loose speculation, of uncertain guess,—a question of degree in each case. The necessary result would be to produce infinite uncertainty and delay in the settlement of estates,—the very last branch of the law in which these elements should be permitted to gain a footing.

The civil law, from which the idea of revocation by birth is borrowed, did not imply total revocation from changes in property. 2 Domat's Civil Law (Cushing's ed.), pp. 326, 327, ¶ 3127, art. xii.

If the question of fact as to change of intention were open to discussion here, we should ask, in the words of *Aiken*, J. (2 Vt. 75), "Does the fact of a change in a man's [financial] circumstances afford a stronger presumption of an alteration of his intentions, than the fact of his preserving his will unaltered and unrevoked does of his intentions remaining the same?"

If the foregoing views are correct, there is no ground for the position that there has been an implied revocation of this will; nor is there any ground for asserting that there has been an express revocation. There is no evidence that any of the acts of revocation enumerated in *s.* 14, *c.* 193, have ever been performed by the testator. Section 14 is a substantial reënactment of the statute of frauds respecting revocation of wills of realty. It was a part of the New Hampshire provincial statute of May 2, 1719, and has now been made applicable to revocation of wills of personalty as well as realty. Before the New Hampshire statute of 1848, *c.* 726, less formality was required in executing wills of personalty than wills of realty. Hence, a will embracing both real and personal estate might be revoked as to the personalty by another instrument not sufficiently executed to operate as a will of realty. See *Marston* v. *Marston*, 17 N. H. 503. But now the same formalities are required to execute or revoke a will of either description.

If the bundle of papers in which the will was found had been kept in an insecure place, that would not have justified the court in holding that the will was revoked. *Fellows* v. *Allen*, 60 N. H. 439, is a recent and decisive authority;—see, also, *Cheese* v. *Lovejoy*, L. R. 2 Prob. Div. 251—*S. C.*, 21 Moak's Eng. 633; and *Andrew* v. *Motley*, 12 C. B. (N. S.) 514. *A fortiori*, there is no revocation when the bundle containing the will was found, not "in the fourth drawer of an old bureau," nor "lying about in the kitchen," but "in the safe of the testator." Nor is the will revoked by the fact that there were found in the same place "several apparently incomplete drafts or memoranda of wills never executed, without date, some of which were apparently made since the date of said will." "Of course, a mere intimation by a testator of his intention to make by a future act a new disposition, does not effect an actual present revocation." 1 Jar. Wills (Bigelow's ed. 171, Ran-

dolph's ed. 337). Compare *Lewis* v. *Lewis,* 2 Watts & S. 455, where an unexecuted will of apparently later date was found with the will in question. If the testator had actually signed one of the later drafts, and had it attested by a witness, it would not have revoked this will. *Reese* v. *Court of Probate of Newport,* 9 R. I. 434. " The rule is well settled that the actual declaration of an intent to revoke by some future act is no actual revocation." *Brown* v. *Thorndike,* 15 Pick. 388, 408.

Oral declarations of the testator are not admissible to show his understanding that the will was revoked. The direct fact of revocation cannot be proved in this way. Declarations of the testator not made in testamentary form are not competent as principal evidence of revocation. When an act has been done which would be sufficient to work a revocation, if done with that intent, then declarations of the testator may be admissible to show the intent. But here there is no proof of any such act. No act of " cancelling, tearing, obliterating, or otherwise destroying " has been performed upon the instrument itself by the testator, or by anybody else. The instrument is produced uninjured: hence the declarations are inadmissible. " Mere words will in no case amount to a revocation." This is the class of testimony which the statute of frauds has anxiously and carefully excluded. As the statute directs how a will shall be made, so it prescribes as to its revocation. A will not in accordance with the statute is not valid: a revocation not within its terms leaves the will in full force. The cancellation of a will cannot be shown by the declarations of the testator, the will being produced, for there would not be the statutory revocation. His declarations would be unavailing against a formal, uncancelled will.

The question may be asked, Is not revocation purely a question of intention? We answer, No. " Revocation must include the intention of the testator, but mere intention without some act is not effective to destroy a will." *Allen,* J., 60 N. H. 441. " There must be the act as well as the intention.  *  *  *  All the destroying in the world without intention will not revoke a will, nor all the intention in the world without destroying: there must be the two." L. R. 2 Prob. Div. 253. If revocation is in any sense an act of the mind, still it must be demonstrated by some one of the outward and visible signs or symbols specified by the statute. " Since the statute of frauds, it is clear that a man cannot revoke his will, even by manifesting in the strongest way his intention that it shall no longer operate, unless he pursues one of the modes pointed out " by the statute. See *Andrew* v. *Motley,* 12 C. B. (N. S.) 514, 523. " The statute positively requires things to be done, and not merely said or intended to be done." *Hise* v. *Fincher,* 10 Ired. 141. An intention to revoke is utterly inoperative unless there be some act done in pursuance of that intention; and it must be one of the revoking acts specified in the statute.

"It would be to but little purpose to prescribe formalities for the making and authentication of wills if persons interested in setting the same aside were permitted to do so by parol proof of an intention to revoke. * * * With equal propriety we might hold that an intended will which the testator was prevented from executing * * * should be established as against the heirs." *Kent* v. *Mahaffey*, 10 Ohio St. 204, 218.

The authorities go so far as to hold that if the intention to revoke is not executed, it makes no difference that the execution was prevented by fraudulently inducing the testator to believe that the will had been destroyed in accordance with his orders. *Hise* v. *Fincher*, 10 Ired. 139; *Mundy* v. *Mundy*, 15 N. J. Eq. 290; *Doe* v. *Harris*, 6 Ad. & E. 209; *Kent* v. *Mahaffey*, 10 Ohio St. 204; *Boyd* v. *Cook*, 3 Leigh 32; *Malone's Adm'r* v. *Hobbs*, 1 Rob. (Va.) 346; *Runkle* v. *Gates*, 11 Ind. 95. So where cancellation is prevented by force, there is no revocation. *Gains* v. *Gains*, 2 A. K. Marshall 190. See, generally, as to the inefficacy of unexecuted intention and the inadmissibility of parol declarations, *Perjue* v. *Perjue*, 4 Ia. 520; *Clark* v. *Morrison*, 25 Penn. St. 453; *Lewis* v. *Lewis*, 2 Watts & S. 455; *Massey* v. *Massey*, 4 Har. & J. 141; *Gay* v. *Gay*, 60 Ia. 415; 46 Am. Rep. 78; *Parkhill* v. *Parkhill*, Brayt. (Vt.) 239; *Graves* v. *Sheldon*, 2 D. Chip. (Vt.) 75.

As to after-acquired real estate,—"any estate right or interest in any real property, acquired by the testator after making his will, shall pass thereby if such shall appear to have been his intention." Gen. Laws, c. 193, s. 2.

The words of this residuary clause sufficiently show the intention of the testator to dispose of all the estate of which he might be the owner at the time of his death. *Loveren* v. *Lamprey*, 22 N. H. 434, 443, 444;—see, also, *Winchester* v. *Forster*, 3 Cush. 366.

The appellee cannot introduce oral declarations of the testator to disprove the intention inferable from the will. The general rule is, that the intention of the testator must be gathered from the words used by him in the will, and not from his oral declarations. *Ordway* v. *Dow*, 55 N. H. 11. The above statute was not intended to establish an exception to this rule. When the legislature say "if such shall appear to have been his intention," they mean, intention appearing by the will, not by extrinsic oral declarations.

(Counsel also cited and commented on the following authorities: Swinburne Wills, part vii, s. 15; *Brook* v. *Warde*, 3 Dyer 310; *Mountague* v. *Jeoffereys*, Moore 429; Roll. Abr. 616; 1 Eq. Cas. Abr. 410; 1 Poph. 108; Godolph. 57; *Symson* v. *Kirton*, 1 Cro. Jac. 115; *Cranvell* v. *Sanders*, 1 Cro. Jac. 497; *Winkfield* v. *Combe*, 2 Ch. Cas. 16; *Overbury* v. *Overbury*, 2 Shower 242; *Hilton* v. *King*, 3 Lev. 86; *Earl of Lincoln's Case*, Shower P. C. 154; 1 Eq. Cas. Abr. 412; *Lugg* v. *Lugg*, 2 Salk. 592; 1 Lord Raym. 441; 12 Mod. Cas. 236; *Brown* v. *Thompson*, 1 Eq. Cas. Abr. 413; 1 P. Wms.

304, *n.* ; *Eyre* v. *Eyre*, cited in 1 P. Wms. 304, *n.* ; *Meredith* v. *Meredith*, cited in 1 Phillim. 480 ; *Pollen* v. *Huband*, 1 Eq. Cas. Abr. 412 ; *Ward* v. *Phillips*, cited in 1 Phillim. 482, 483 ; *Parsons* v. *Lanoe*, 1 Ves. 189 ; Amb. 557 ; 1 Wils. 243 ; *Wells* v. *Wilson*, cited in 5 T. R. 52, *n.*, and 1 Phillim. 485, 486 ; *Jackson* v. *Hurlock*, Amb. 487 ; 2 Eden 263 ; *Shepherd* v. *Shepherd*, 5 T. R. 51-54, *n.* ; *Christopher* v. *Christopher*, 2 Dick. 445 ; 4 Burr. 2171 ; *Spraague* v. *Stone*, Amb. 721 ; *Wright* v. *Sarmuda*, 2 Phillim. 266, *n.* ; *Emerson* v. *Boville*, 1 Phillim. 342 ; *Talbot* v. *Talbot*, 1 Hag. Ecc. 705 ; *Johnson* v. *Wells*, 2 Hag. Ecc. 561 ; *Gibbens* v. *Cross*, 2 Add. Ecc. 455 ; *Gibbons* v. *Caunt*, 4 Vesey, Jr., 840 ; *Ex parte Earl of Ilchester*, 7 Ves., Jr., 348 ; *Sheath* v. *York*, 1 Ves. & B. 390 ; *Goodtitle* v. *Otway*, 2 H. Black. 516 ; 1 Bos. & Pull. 576 ; *Lancashire* v. *Lancashire*, 5 T. R. 49 ; *Kenebel* v. *Scrafton*, 2 East 530 ; *Brown* v. *Clark*, 77 N. Y. 369 ; *Vawser* v. *Jeffery*, 3 Russ. 479 ; *Livingston* v. *Livingston*, 3 Johns. Ch. 148, 155 ; *Walton* v. *Walton*, 7 Johns. Ch. 258, 265 ; *Adams* v. *Winne*, 7 Paige Ch. 97 ; *Brydges* v. *Duchess of Chandos*, 2 Vesey, Jr., 417, 428 ; *Cook* v. *Oakley*, 1 P. Wms. 302 ; *Woolery* v. *Woolery*, 48 Ind. 525 ; *Gage* v. *Gage*, 12 N. H. 371, 377, 379.)

*Marston & Eastman* and *Frink & Batchelder*, for appellee.    This may not be a case of new impression, but it certainly is one without precedent.    The cases approaching it are not valuable as precedents, because the circumstances of each case and the local laws determining them are entirely different.

The first question which to us seems to arise in the case is, What change in the circumstances of a testator or his estate, short of total alienation, will operate to revoke a will, the intention concurring ?

We contend that a will may be revoked by a change in the estate or circumstances of the testator, if the intention to revoke it can be found from these changes and other circumstances.

This seems to us to be the true rule of law in this behalf: A will may be revoked by changes in the estate and circumstances of the testator, and the intention to revoke is to be derived from these changes and acts of the testator connected therewith.    This rule of law does not conflict with the statute of frauds.    If the testator chooses to rely upon his intention to revoke his will, that statute defines the manner in which he may express his intention.

None the less there is excepted from the operation of that section of the act, revocation implied by law from changes in the circumstances or estate of the testator ; and while his intention is not the sole test of a revocation under this changed condition of his estate, yet, if the changes have been so substantial as to defeat his original design in making a will, then the will is revoked.    To reason that a testator cannot revoke his will, if he chooses, in any other way than by one of the modes defined in *s.* 14 of our act, is

gainsayed by the fact that he can alienate his whole estate, and thus *ex necessitate rei* make it of no effect; or he can marry, and, if competent, beget a child. These are voluntary acts of revocation just as much as the destruction of a will.

The appellants rely upon *Fellows* v. *Allen*, 60 N. H. 439. Judge *Allen* says, in his opinion, so long as anything remains upon which the will can operate, there can be no revocation as matter of law, except by the mode pointed out. To support this proposition he cites *Graves* v. *Sheldon*, 2 D. Chip. (Vt.) 71, and a New Jersey case. Neither case, we think, sustains the proposition in its full extent; and in the Vermont case, under their statute no other decision than the one reached was possible.

It is always fair to test a general proposition by an extreme illustration. Let us suppose a case. A person having an estate of $100,000 in bank stock, makes his will, and gives to his son A all his stock in the A. National Bank, which is 250 shares; to his son B all his stock in the B National Bank, which is 250 shares; to his daughter C all his stock in the C National Bank, which is 250 shares; and to his daughter D all his stock in the D National Bank, which is 250 shares; and to his friend F he gives his walking stick, of the value of nine shillings, and makes the same friend his residuary legatee. Before his death he sells all his bank stock, and merges and converts it into money or other property. The gifts of the bank stock being specific legacies are adeemed. The testator obviously forgets his will, and dies. Would any court hold that F took the whole estate to the entire exclusion of the children? And yet Judge *Allen's* general proposition would lead to this conclusion, for there certainly remains the walking-stick and the residuary bequest for the will to operate upon.

We submit, with great confidence, that a will may be revoked by a change in the circumstances or estate of the testator, if such appears his intention; and such will appear to have been his intention if the changes are so great as to substantially change the whole disposition of his estate.

(Counsel commented on the changes in the testator's property, and the effect of those changes on the interests of the various legatees, claiming that many of the children were thus disinherited, and the portion of the residuary legatees immensely increased.)

Can any one believe that such was the intention of Gen. Hoitt? Are not these facts alone sufficient to raise a reasonable presumption, and much more than that, of a change of purpose in respect to the disposition of his property? It is now utterly impossible to effectuate the intention of the testator as manifested by the will. Nothing has occurred from which it can be inferred that he intended to practically disinherit six daughters, or to diminish by two fifths the bequests to Samuel and his children, his property having much more than doubled in value. If Gen. Hoitt had made anything like such a disposition of his property in the last

year of his life, it would have been conclusive evidence of demen-
tia.    Manifestly the general intent of the testator was to dispose
specifically of all his estate, and not have it go into the residuum,
and not totally or substantially disinherit any of his children.
This intent is defeated if this will is sustained, and the bulk of the
estate passes to the residuary legatees.    That the testator regard-
ed the will as revoked, and so intended, seems fixed by the circum-
stances.    It is true, that the fact that it was found among valueless
papers would not of itself operate as a revocation, but it tends to
show, coupled with the presence of other memoranda for a new
will, that he intended and believed this will of no legal effect.    So,
too, this intention may be inferred by the changes in his family
when associated with these other circumstances.    The whole
theory of an implied revocation in the case of a marriage and
birth of a child is, that the testator must have intended a revoca-
tion on account of new obligations.    So, too, here, while the
changes in his family are not such as arbitrarily work a revoca-
tion, yet they may be considered with other circumstances as indi-
cating the testator's probable intention and understanding.

It is the disposition of the modern courts everywhere to give
effect to the intention of the testator, not only in construing a will,
but also in establishing one.    The days when the will of a testator
was defeated by mere technicalities has passed, we hope, forever.
It is, and should be, the endeavor of every intelligent and right-
minded tribunal to make the intention of the testator the govern-
ing principle.

If the court set up an instrument which by reason of changes
in the testator's family and estate he believed was of no legal
effect, it does not execute his will.    It makes a disposition of his
property he did not intend at his death.    It is the court, and not
the decedent, that exercises the testamentary mind.    The court,
and not the deceased, is the will-maker

As there may be such changes in the estate and circumstances
of a testator as to revoke his will, the true inquiry then should be,
by the court, Did the testator so intend?    And when it finds the
testator's intent interpreting and aiding these changes, the court
should not hesitate to execute his intention.

It is said the statute defining the modes of revoking a will was
passed to prevent frauds and perjuries.    Instead of preventing
wrongs, it would work the grossest injustice if it disinherited mem-
bers of a family by reason of its arbitrary construction, when the
deceased intended no such wrong.

The suggestion, that if there is any property left upon which the
will can operate the will must stand, has no foundation in principle
whatever.    If the changes in circumstances lead to the presump-
tion of an intention to revoke, then the will is revoked; and the
fact that something remains for the will to operate upon is not a
bar to the presumption.

After making the will, the testator's wife, for whom he had made ample provision, died, and he took another, for whom, of course, no provision at all was made. Marriage alone ought everywhere, as now in England, to revoke a will. What possible change of circumstances would be more likely to change a man's intentions, in respect to the disposition of his property, than his marriage? And when there is added to that great fact these other facts, that the will disposed specifically of all, or nearly all, the property the testator then had; that by the conversion of his property into other forms more than four fifths of it would fall into the residuum, as well as all the additions thereto after the making of the will, amounting to more than $40,000,—it seems to us that not only do these great changes of circumstances lead to a reasonable presumption of an alteration of the testator's mind and will, but they are so inconsistent with the testament as necessarily to imply a revocation.

There was no arbitrary rule at common law as to what changes in an estate revoked a will. They must be such as to imply a presumption that the testator intended that his will should cease to be his will; that he no longer intended it to operate as a will. This leads us to the only sensible and reasonable conclusion, that the court are to find this intent from the will, the changes in the estate, and attendant circumstances. Whenever the court finds an intention to have existed on the part of the testator, by reason of changes in his estate, to revoke his will, then the law implies a revocation. In this way, and in this way only, can the intention of a testator be executed; otherwise the court, although satisfied of the testator's intent to revoke his will by the disposition of and changes in his estate, may make the will of the testator what they know was not his will.

We think it worthy of consideration, that changes in the estate of the testator, in terms at least, are not recognized by any statute of any state in the Union excepting ours, as working a revocation of a will. The words employed in other statutes, such as "condition or circumstances," seem in some states to have a limited interpretation.

The appellee does not contend, as the appellant says he must, "that *s*. 15, *c*. 193, of the Gen. Laws was intended to authorize the court to imply a total revocation at their discretion from any change whatever in the circumstances of the testator or his family, devisees, legatees, or estate;" but they do contend that *s*. 15 authorizes and requires the court to imply a total revocation from such changes, either in the circumstances of the testator himself, or in the circumstances of his family, legatees, or estate, in either one or all, as render it impossible to effectuate the intention of the testator as expressed in the instrument propounded as his will. The statute clearly recognizes the fact that there may be such changes in the circumstances of the testator or his family;

legatees, or estate, as render it manifest that the instrument which was his will when it was executed no longer expresses his wishes in respect to the disposition of his estate.

A valid will is one's last will, and when the instrument which was a will when executed ceases to be the expression of the maker's wishes in respect to the disposition of his property, it is no longer a valid instrument. It is intent alone that constitutes a testament or revokes a testament. The law may, and does, prescribe rules for ascertaining the intent to dispose of property by a testament and the intent to revoke a testament, and the whole object of all such rules is to make certain the intent.

Wills are everywhere revoked by implication as well as by express words and acts. Lord *Eyre*, C. J., said, in *Goodtitle* v. *Otway*, 1 Bos. & P. 594, "Implied revocations are where the testator has done certain acts, or certain alterations have taken place in his situation, as necessarily leads to the inference of an intention to revoke his will."

But the appellees proceed to assert that the only causes of revocation by implication at common law are (1) marriage and issue subsequent to making the will; (2) alienation of the things devised; (3) death of the devisee in the lifetime of the testator; and that the revocation of the will takes place in consequence of a rule of law, independently of any question of intention of the party himself. Both of these propositions we utterly deny.

It is true that Lord *Kenyon* said, in *Lancashire* v. *Lancashire*, 5 T. R. 49, that marriage and birth of a child revoked a will, on the ground that there was a tacit condition annexed to the will when made that marriage and birth of a child should revoke it. No law, no court, no single judge, ever said that, before or afterwards, until 1838, when the English courts adopted that reason for holding the will revoked by marriage and issue, because they said it was the only ground consistent with the statute of frauds,—the English statute of frauds having no such provisions as are contained in s. 15 of our statute. Lord *Mansfield* put the revocation, in such a case, upon the ground of presumed intention, which, he said, might be rebutted by any sort of evidence, and Chancellor Kent puts it upon the same ground. 4 Kent Com. 521.

We have no occasion to remark upon what are sometimes termed revocations by alienation of the thing devised, and by death of the devisee in the life-time of the testator. In either case, there is no question of intention, and nothing for the court to pass upon; for in one case there is nothing to bestow, and in the other nobody to take. Lord *Eyre*, C. J., in *Goodtitle* v. *Otway*, said, "If a testator parts with his estate after making his will, the subject is gone. The will is not revoked, for a revoked will may be reëstablished by republication, but republication wont bring back the estate."

Formerly, marriage of a woman worked a revocation of her will, not because of any presumed intention on her part to revoke it, but

rather because she could not revoke it if she wanted to, because she could neither make nor break, nor do any valid act, in respect to a will.

The position, therefore, of the appellees, comes simply to this,— that, by the common law, courts are authorized to imply a revocation in one case only, to wit, a subsequent marriage and the birth of a child; and that *s.* 15 of our statute authorizes revocation by implication in that case, and in no other. This is a very narrow and very shallow view of the law, as is the reason adduced to sustain it, namely, that it "leaves no room for uncertainty." Such a rule of law would lead to this absolutely certain result,—that in many, very many, cases, the estates of deceased persons would pass, not to the heirs as the law directs, nor yet according to the last desire and will of the deceased, but to others having no right or title thereto.

We maintain, that in case of serious doubt it is far better to resolve the doubt in favor of the heir whom the law favors, and will not allow to be disinherited by any doubtful construction. There is no rule of the common or civil law, that certain specified changes of circumstances, and no other, shall work a revocation of a will by implication. No court has ever adopted such a rule of action. Every case is to be judged by itself, for it is not likely that two cases have ever arisen, or ever will arise, where the changes of circumstances are exactly alike. The law which obtains everywhere has never been stated better than by Chancellor Kent, that "a will is revoked by implication whenever there is a reasonable presumption of an alteration of the testator's mind arising from circumstances occurring after the making of the will."

Lord *Mansfield* said, in *Brady* v. *Cubitt,* 1 Doug. 31, "There may be many circumstances where a revocation may be presumed," and *Buller,* J., said, in the same case, "Implied revocations must depend upon circumstances at the time of the testator's death." There are many cases in the English reports where revocation has been implied by an attempt to alienate the thing devised,— although the attempt was a failure, there being no change in the title whatever,—and this on the ground that an attempt to alienate was repugnant to the will, and manifested an intent to revoke it. 7 Bacon Abr. 366; *Beard* v. *Beard,* 3 Atk. 72, 743.

So the least alteration of the testator's interest in an estate by any act of his shows a different intention, and revokes his will in whole or in part, as the case may be. *Sparrow* v. *Hardcastle,* Amb. 224.

Both marriage and issue do not always imply a revocation. Lord *Mansfield* said that they did not in the case of *Brady* v. *Cubitt,* because there were other facts in that case rebutting the presumption of any intention to revoke.

(Counsel here entered into an elaborate review of the English cases, in order to show that the judicial causes of implied revocation had not been completely defined or established at the date of

the separation of the colonies in 1776, or at the date of the New Hampshire statute in 1822. In this connection great stress was laid upon *Johnston* v. *Johnston*, 1 Phillim. 447.)

The court, in *Sneed* v. *Ewing*, 5 J. J. Marshall (Ky.) 472, said, "Some authorities require both marriage and issue to revoke a will, and others admit either one or the other; but reason and principle, as well as a preponderance of authorities, repudiate the motion that both marriage and issue are indispensable to revoke a will," and the court refers to 2 Fonblanque, note *c*, as sustaining the same view.

In *McCullum* v. *McKenzie*, 26 Iowa 510, it was held that the birth of a child alone operated to revoke a will.

In *Tyler* v. *Tyler*, 19 Ill. 151, held that marriage subsequent to making a will revoked it. Affirmed in 85 Ill. 41.

By English statute, 1 Vic., wills are now absolutely revoked by the marriage of either man or woman.

We submit that no single change in the circumstances of any man would be more likely to alter his views in respect to the disposition of his property than his marriage.

In *Cooper's Case*, 4 Penn. St. 88, the changes of circumstances related solely to the estate, and in that regard resembled the case at bar more than any to be found in the books. The case was decided on the ground that the intention of the testator, as expressed in his will, could not be carried out by reason of changes which implied a revocation; that to give effect to that instrument as the testator's will, would be for the court to make a will for the testator.

The sole question in this case for the court to decide is, whether the changes which took place in the circumstances of the testator himself, and in his family, and his estate altogether, raise a reasonable presumption of an alteration of the testator's mind in respect to the disposition of his property. If they do, the law implies a revocation, and there is nothing left for the court but to pronounce the conclusion of law, as in all other cases, upon facts found or agreed. The law is certain. There is no possible doubt about it, and therefore it is perhaps safe to say that but little aid can be derived from reported cases, because the facts and circumstances are not alike.

This residuary bequest, we submit, cannot be holden to pass under its terms any of the property the testator then had and specifically gave away, or its reinvestments. The testator gave to the residuary legatees all his estate "not disposed of in his will." There is authority for saying that these words exclude from the operation of this residuary clause all the property thus given away, and that whether adeemed or alienated it cannot be holden to pass into the residuum on account of these words of limitation. *Att'y Gen.* v. *Johnstone*, Amb. 577; *Davers* v. *Dewes*, 3 P. Wms. 40.

Thus it appears that the testator sold property specifically devised or bequeathed, amounting to $25,700. This ought not to

pass into the residuary estate, because it was not included in the terms of that clause of the will defining what part of the estate should so pass; or, in the words of the books, the testator narrowed the title of the residuary legatees so as to exclude them from lapsed legacies.

This is a question of intention on the part of the testator, and if the court is of the opinion, from the whole will, that the testator intended to use the words in a restricted sense, then it is bound so to construe it. Williams Ex'rs, part iii, book iii, s. 1315.

These words, " not otherwise disposed of," in the residuary clause seem to us also to restrict this bequest to the property the testator had at the time of making the will. He seems to have had in mind the intent to dispose of his property only as it then existed. The common-law rule seems to be, that a lapsed devise of real estate, or the price of real estate, as well as after acquired real estate, goes to the heir, and not to the residuary devisee. Williams Ex'rs, part iii, book iii, s. 1314; *Spence* v. *Robins*, 6 G. & J. 507; *Greene* v. *Dennis*, 6 Conn. 293; *Treat* v. *Treat*, 35 Conn. 215.

What the effect of our statute may be as to lapsed legacies has never been determined here, although it has been considered in Massachusetts. The statute there, however, differs from ours. *Thayer* v. *Wellington*, 9 Allen 283; *Prescott* v. *Prescott*, 7 Met. 141. Conceding that such a statute changes the rule as to real estate, so far as property acquired after the death of the testator is concerned, it simply makes it a question of intention. This is a question of fact, not only to be determined from the context of the will, but from the acts and declarations of the testator, and the situation of the devisees and legatees. If the court have any doubt as to the intent of the testator, it is a question of fact which may be left to a jury upon proper issues. The statute of Massachusetts, which is interpreted in the cases before cited, expressly limits the ascertainment of the intention to the will itself. Here the court is at liberty to find it from any and all sources which will throw light upon the testator's mind.

BLODGETT, J. No express revocation appears in this case. The will of the testator, executed in accordance with the statute formalities, has not been revoked by any subsequent " will or codicil, or by some writing executed in the same manner, or by cancelling, tearing, obliterating, or otherwise destroying the same by the testator, or by some person by his consent, and in his presence," as required by Gen. Laws, c. 193, s. 14. On the contrary, it was found in his safe after his decease, and in its original condition. It is true that it was in a bundle of papers of no pecuniary value, and "included in this bundle were several apparently incomplete drafts or memoranda of wills never executed, without date, some of which were apparently made since the date of said will."

But *Fellows* v. *Allen*, 60 N. H. 439, 441, is a recent and direct

authority that the fact of a will being found among worthless papers works no revocation of it; and the authorities, as well as reason, demonstrate that the memoranda which, at most, are merely evidentiary facts of an inchoate intention to make another will, have no legal significance as acts of revocation; for, although the purpose of the mind always gives character to the act done, still, the legislature having established certain modes by which a will may be revoked, it is not within the legitimate power of courts to dispense with such requirements, and accept even a definite intention to perform the prescribed act for the act itself.

Neither has the will become inoperative, as a whole, from necessity, either by an entire loss of the testator's estate, or its total alienation, or by the decease of all the devisees without descendants, and so leaving nothing upon which it can operate.

If, therefore, there has been a valid revocation, it must be one arising from legal presumption or implication; and this, in fact, is the principal contention.

The existing statute as to the revocation of wills, which was originally adopted in 1822, after pointing out the modes by which a will may be revoked, expressly excepts any revocation implied by law from changes in the circumstances of the testator, his family, devisees, or estate, occurring between the time of making the will and his death.   G. L., c. 193, ss. 14, 15.   But what those changes are s. 15 does not in any manner attempt to define; and the effect consequently is, to leave the matter of revocation by legal implication just as it stood before the enactment of that section. That is to say, s. 15 (which in the act of 1822 was a proviso to what is now s. 14) is to be taken not as a recognition and adoption of the common-law doctrine of implied revocation, but as a recognition and adoption of the English decisions under ss. 5, 6, and 22 of the English statute of frauds relative to the revocation of wills, passed in 1676; for the common law as to such revocations was abrogated by that statute.

The English statute was doubtless the basis and model of our statute, directly or indirectly; and the proviso in the latter, we think, is to be regarded as merely explanatory of the preceding part of the section, prescribing the manner of express revocation. Practically, and in effect, it was an adoption, under then existing conditions, of such implied revocations as had been introduced and established by the English courts, contrary to the plain meaning of the English statute, and solely through the usurpation of legislative power.

But the English courts did not go the length of establishing a rule that revocation might be shown by any change of circumstances affording satisfactory evidence of the testator's revoking intention, but stopped far short of it, and restricted its application to a few exceptional cases, as to which it was held the statute did not apply. Hence there is no tenable ground for holding that any causes

of revocation were intended by our legislature to be embraced in the proviso to the act of 1822, aside from the existing exceptions established by the English courts upon supposed equitable considerations; and much less can it be held that any alteration was effected or intended by the revision of 1842, making the proviso a separate section, and slightly changing its phraseology. And as strongly tending to show that the purpose of the legislature was such as has been indicated, and that such has been the universal understanding of the bar of this state, it is a significant fact that no litigation has arisen as to the legislative intent, or the meaning of the language used in its expression, during the more than sixty years which have elapsed since the statute was first enacted.

No new cause of revocation being introduced by the statute, the true inquiry is, whether the facts of this case bring it within any of the exceptions upon the subject of implied revocation recognized by the English courts after the adoption of the statute of 1676, which were quite limited in number, and reasonably well defined and understood at the time our statute was enacted.

The causes assigned upon this point as ground of revocation are,—subsequent changes in the circumstances of the deceased, his family, and estate. They are, substantially, the death of his wife and his son Franklin, both of whom were legatees; his second marriage, but without issue; the alienation of the larger portion of his estate; and its nearly threefold increase in value through natural causes and judicious investments.

But total revocation cannot be implied from the death of the wife and the son: " the death of a devisee is a contingency always in view." *Shaw*, C. J., in *Warner* v. *Beach*, 4 Gray 162, 164. " I know of no case," said *Denman*, C. J., in *Doe* v. *Edlin*, 4 Ad. & E. 586, " where it has been held that the removal of an object of affection and bounty by death has been taken to be an implied revocation of a will, and in my opinion it does not operate so." And see *Fellows* v. *Allen, supra.*

Nor can it be implied from the testator's remarriage, because the indispensable common-law requisite of the subsequent birth of a child is lacking. 1 Jar. Wills (5th Am. ed.) 272 ; 1 Redf. Wills 293 ; Parsons Wills *59; Worthington Wills *528. " This principle of law is incontrovertibly established." 4 Kent Com. 522. And in this connection it should also be borne in mind that the rule never applied, except in cases where the wife and after-born children, the new objects of duty, were wholly unprovided for in the will, and where there was an entire disposition of the whole estate to their exclusion and prejudice : therefore, inasmuch as the widow and children of a testator, not provided for in a will, are, under our statutes, entitled to the same share of the estate as if he had died intestate, the sole reason upon which the rule was grounded no longer exists ; and so the rule itself has become inoperative and obsolete in this jurisdiction.

The inquiry thus becomes restricted to the effect of the changes in the testator's property,—the phrase, "circumstances of the testator," etc., relating to new family ties, and not to changes in property. 4 Kent Com. 521, and authorities generally.

But if it were apparent, as it certainly is not, that in the case of a testator an entire revocation by legal implication resulted, either before or after the statute of 1676, from any change whatever of condition or circumstances except that of a subsequent marriage and child, it is the undoubted general rule that a partial revocation only produces what is inaptly and inaccurately termed a revocation *pro tanto*, instead of an ademption of the subject of the devise, and thus necessarily limits the operation of the will to the extent of the alienation; not, however, by reason of any defect in the will itself, but because it pleased the testator to make a disposition of such part of his estate different from what he originally intended, which it is always competent for him to do, either by a conveyance, or by a new will or codicil. See *Fellows* v. *Allen, supra; Carter* v. *Thomas,* 4 Greenl. 341, 343, 344; *Graves* v. *Sheldon,* 2 D. Chip. (Vt.) 71, 75; *Blandin* v. *Blandin,* 9 Vt. 210, 211; *Hawes* v. *Humphrey,* 9 Pick. 350; *Terry* v. *Edminster, ib* 355, *n.*; *Webster* v. *Webster,* 105 Mass. 538, 542; *Balliet's Appeal,* 14 Penn. St. 451; *Brush* v. *Brush,* 11 Ohio 287; *Floyd* v. *Floyd,* 7 B. Mon. 290; *In re Nan Mickel,* 14 Johns. 324; *McNaughton* v. *McNaughton,* 34 N. Y. 201; *Warren* v. *Taylor,* 56 Iowa 182; *Wells* v. *Wells,* 35 Miss. 638; *Brydges* v. *Duchess of Chandos,* 2 Ves., Jr., 417; 4 Dane Abr. 576, 577; Lovelass Wills 358; 1 Redf. Wills 335; Parsons Wills 63. "Conveying a part of the estate upon which the will would otherwise operate, indicates a change of purpose in the testator as to that part; but suffering the will to remain uncancelled, evinces that his intention is unchanged with respect to other property bequeathed or devised therein." *Weston,* J., in *Carter* v. *Thomas, supra,* 344.

The remaining circumstance, that of the increase of the estate, upon obvious considerations of public policy, has no weight; and to this effect is the great preponderance of authority. *Warner* v. *Beach, Webster* v. *Webster, Graves* v. *Sheldon, Blandin* v. *Blandin,* and *Balliet's Appeal, supra; Brush* v. *Wilkins,* 4 Johns. Ch. 507, 518, 519; *Wogan* v. *Small,* 11 Serg. & R. 141, 145; *Vandemark* v. *Vandemark,* 26 Barb. 416; *Verdier* v. *Verdier,* 8 Rich. Law (S. C.) 135. "A merely general change in the testator's circumstances, as it regards the amount and relative value of his property, will not in general, if ever, have the effect to revoke a will, since the testator, by suffering it to remain uncancelled, does, in effect, reaffirm it from day to day, until the termination of his conscious existence." 1 Redf. Wills 298.

The conclusion then is, that the subsequent changes in the circumstances of the testator, his family and estate, do not imply a revocation of his will. To effect a revocation, both the English

33*

and New Hampshire statutes require certain specified things, which are lacking in this case, to be done, and not merely contemplated, or even actually intended to be done.   It is true that at an early day the English common-law courts fell into the error of exercising legislative power, and materially amending the statute of 1676 by enlarging its specific methods of revocation so as to include revocations founded upon new family ties and obligations on the part of the testator arising from subsequent marriage, issue, and leaving wife and child without provision, and that, inasmuch as our statute must be regarded as a substantial reënactment of that statute in the sense in which it had been interpreted by the English courts anterior to 1822, full effect must be given to their decisions, although plain encroachments upon legislative power; yet no rule was expressly established, and none can be inferred from the decisions, that makes it our duty to trespass still further upon the legislative domain, and so far judicially repeal the statute as to hold that the present case does not come within the purview of its fourteenth section.   Even the English courts had come to a halt prior to 1822, and refused to extend the rule as to implied revocations beyond the precedents; and so have the American courts quite uniformly.   See *Doe* v. *Barford*, 4 M. & S. 10; *Tilghman*, C. J., in *Wogan* v. *Small*, *supra*, and authorities generally.

The rule for which the appellee contends is, that a revocation may be proved or disproved by any circumstantial evidence showing the testator's intention; but the precedents do not support the contention.   On the contrary, after a most thorough examination of the cases reported before the enactment of the New Hampshire statute, it was unanimously held, in *Marston* v. *Roe*, 8 Ad. & E. 14, by the fourteen judges sitting in the cause, that implied revocation takes place in consequence of a rule or principle of law independently altogether of any question of intention; and there is no reason to suppose that the legislature of 1822 took a different view of the reported cases.   If their purpose was to make intention, of itself, a ground of revocation, and thus inevitably incite litigation and "produce infinite uncertainty and delay in the settlement of estates," the presumption is that the statute would have been drawn accordingly.   Even *Johnston* v. *Johnston*, 1 Phillim. 447, upon which great stress has been laid by the appellees, while holding the subsequent birth of a portionless child to be an indispensable requisite which would effect a revocation when aided by other circumstances, and a subsequent marriage not to be an essential requisite, does not hold that the revoking intent may be inferred from a general change of circumstances simply, but makes the controlling principle rest upon new moral obligations and family ties arising after the making of the will, and thus limits its application to cases of subsequent marriage or birth in which the wife or child would otherwise be left without provision for support. This case, however, is not relevant, the will being one of personalty

only, and the decision being made by an ecclesiastical court unencumbered by statute provisions; and if it were relevant, its governing principle when applied to this case would be fatal to the appellees, for the reason that no child was born to the testator subsequently to the execution of his will. This being so, it is of no practical consequence here whether the doctrine of implied revocation rests upon the fact of a changed intention, as held in *Johnston* v. *Johnston,* or takes place in consequence of a rule or principle of law founded on a tacit condition annexed to the will itself when made, independently altogether of any question of intention, as held in *Marston* v. *Roe ;* for the application of either principle to the facts of this case leaves the will unrevoked, because they fail to bring it within any of the exceptions introduced by the ecclesiastical or common-law courts.

But in respect of intention, there is another consideration which may properly be adverted to. If the circumstantial evidence appearing in the case were competent in law and sufficient in fact to show a change of intention on the part of the testator as to his final disposition of his property, it would not appear that his intention would be less defeated by disallowing this will than by allowing it. The only issue is, testacy or intestacy. To this issue the inquiry as to the testator's intention is limited ; and whatever testamentary change he may have thought of making, he had no thought of dying intestate and leaving his property to be disposed of by the statutory rule of descent and distribution. There is no authorized conjecture that if the alternative of intestacy or the unaltered will had been presented to him, he would have preferred the former rather than the latter. Hence, if all the circumstantial evidence were admissible, and if it proved all the appellee claims, the question it would present would be, not how the testator's intent could be carried into effect, but how it should be defeated. The choice would be restricted to two modes of violation, one testate and the other intestate ; and the former, supported by the written and uncancelled evidence which the law regards as the best, would prevail over the latter, which would be sustained by no proof, competent or incompetent, and by no presumption of law or fact. The testator not intending to die intestate, the decree of disallowance for which the appellee contends would be an intestate reversal of a testamentary purpose. "But Gen. Hoitt intended to change his will." Suppose he did : the change could not now be made. The intended alteration (if there was one) is not known, and the altering power has ceased.

The proffered oral declarations of the testator, to the effect that he understood the will was revoked, were rightly rejected. The mere understanding of a testator cannot revoke his will, for legal requirements cannot be thus abrogated ; nor can his oral declarations, for wills cannot be revoked by parol ; nor, upon the great weight of authority, are such declarations evidence, unless they

accompany some act of revocation and thereby become a part of the *res gestœ. Jackson* v. *Kniffen,* 2 Johns. 31; *Dan* v. *Brown,* 4 Cow. 483; *Clark* v. *Smith,* 34 Barb. 140; *Waterman* v. *Whitney,* 11 N. Y. 157; *Randall* v. *Beatly,* 31 N. J. Eq. 643; *Lewis* v. *Lewis,* 2 Watts & S. 455; *Hargroves* v. *Redd,* 43 Ga. 142, 160; *Gay* v. *Gay,* 60 Iowa 415; *Rodgers* v. *Rodgers,* 6 Heisk. (Tenn.) 489; *Smith* v. *Fenner,* 1 Gall. 170; *Doe* v. *Palmer,* 16 Ad. & E. 747; 2 Gr. Ev. (9th ed.), *s.* 690; Abb. Tr. Ev. 124; 2 Stark. Ev. (3d ed.) 1286; 1 Redf. Wills 331.

Such declarations also were not competent upon the testator's intention not to pass by his will after acquired real estate. If a contrary intent is inferable from the will itself, it cannot be disproved by extrinsic evidence. If it is not thus inferable, and may be ascertained by the weight of competent evidence, his declarations are not a part of such evidence.

*Decree of the probate court reversed. Will allowed.*

ALLEN, J., did not sit: the others concurred.